613 A.2d 379

**Eric Lorenzo WATKINS**

v.

**STATE of Maryland.**

**No. 57, Sept. Term, 1991.**

Court of Appeals of Maryland.

Oct. 8, 1992.

96

Jennifer P. Lyman, Assigned Public Defender, Washington, D.C., for petitioner.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

Eric Lorenzo Watkins was convicted by a jury in the Circuit Court for Prince George's County of two counts each of unlawful shooting with intent to disable, use of a handgun in the commission of a crime of violence, and battery in connection with a shooting in which Melvin and Ronald Brown were wounded. The Court of Special Appeals affirmed in an unreported opinion, holding that the trial court did not err when it prohibited defense counsel from questioning State's witnesses regarding either their probationary status or the fact that there were criminal charges pending against them at the time of the shootings. We granted certiorari, and we affirm.

## I.

This case grew out of an early morning altercation which occurred when the defendant and Marlin Marshall encountered a group consisting of Ronald, Melvin, and Kelvin Brown, and Demetrius "Tony" Fultz. The defendant does not deny that he shot Melvin and Ronald. He contends, rather, that he shot them in self-defense. According to the defendant, the meeting was called to resolve a dispute over the quality of drugs which Marshall had delivered to Fultz earlier that evening. All other participants in the meeting denied that drugs were in any way involved.

The defendant testified that Fultz called Marshall's pager at about midnight and that Marshall returned the call. The defendant said that Marshall and Fultz were arguing about the quality of the drugs Marshall had delivered to Fultz, and that at some point during the conversation the defendant took the telephone from Marshall and spoke briefly to Fultz and then to one of the Brown brothers. The defendant stated that following the telephone conversation he and Marshall went to meet Fultz and, as it turned out, the Brown brothers, to discuss what was to be done.

On the way to that meeting, Marshall told the defendant to take a gun from under the floor mat of the vehicle in which they were riding and to carry it to the meeting. The defendant said that after the parties met, he fired his weapon in self-defense because the Brown brothers and Fultz, whom he believed to be drug dealers and therefore probably armed, were walking toward him after expressing irritation that he had interjected himself into a conversation between Marshall and Fultz.

## II.

The defendant argues that the trial judge improperly restricted his cross-examination of Fultz and of the Brown brothers. With respect to Fultz, the defendant sought to introduce evidence that Fultz had been convicted of unlawfully carrying a handgun on March 9, 1989, six days before

the incident involved in this case. The defendant offered documentary evidence of this conviction because Fultz had, on cross-examination, denied that he had a gun on March 9. Although the trial judge initially ruled that the evidence was inadmissible, he did permit further cross-examination of Fultz out of the presence of the jury. Fultz then admitted he had been in possession of a handgun on March 9, stating that he had originally been confused concerning the date. The trial judge then permitted additional cross-examination of Fultz in the presence of the jury, and Fultz again admitted to possession of the handgun on the day in question. Thus, the fact sought to be elicited was ultimately placed before the jury, and there was no error in connection with the court's ruling concerning the cross-examination of Fultz.

■ During the cross-examination of Ronald Brown, defense counsel approached the bench to seek leave of court to question the witness concerning a pending theft charge. The entire discussion of this matter consisted of the following:

DEFENSE ATTORNEY: Your Honor, I have information that Mr. Brown has a pending case that's a theft charge and he goes to trial on April 3rd.

THE COURT: Don't mention it.

DEFENSE ATTORNEY: The reason I'm saying that, I believe that I have a basis for thinking he may have been given some consideration in exchange for probation. I want to ask about the fact this happened.

PROSECUTOR: Your Honor, of course, that's exculpatory evidence and I certainly would have told [defense attorney] any deals that I had made with anybody that is testifying.

THE COURT: Alright.

DEFENSE ATTORNEY: Thank you.

(In open court.)

DEFENSE ATTORNEY: That's all I have.

Defense counsel clearly accepted the prosecutor's statement that no "deal" had been made with the witness, and acquiesced in the court's ruling. Accordingly, there is no basis for appeal from this ruling.

 The defendant attempted to show that Melvin and Kelvin Brown were on probation. This effort was grounded solely [1] on the belief that *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), compels the admission of evidence that any State's witness is on probation for any crime, if that evidence is offered by the defendant. The trial judge did not believe *Davis* painted with such a broad brush, and neither do we.

Concededly, some of the language of *Davis* is broad in scope, and appears to support the interpretation that evidence of the probationary status of a State's witness is always admissible.

> The accuracy and truthfulness of [the witness's] testimony were key elements in the State's case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness's] vulnerable status as a probationer, ... as well as of [the witness's] possible concern that he might be a suspect in the investigation.

*Id.* at 415 U.S. 317–18, 94 S.Ct. at 1110–11 (citation omitted). The facts of *Davis*, and other language in the Court's opinion, suggest, however, that the holding of that case was narrower.

In *Davis*, the evidence showed that a bar in Anchorage had been broken into and a safe weighing several hundred pounds had been removed. On the afternoon of the break-in the safe was discovered 26 miles from the site of the burglary, near the home of Richard Green. Green testified that at about noon on the day in question he had seen two

---

1. The defendant did not suggest that either witness had received probation as a result of any bargain with the State to give favorable testimony in this case.

individuals near where the safe was later found. He identified Davis as one of those two individuals. Although there was some evidence tending to show that the safe may have been transported in a vehicle that had been rented by Davis, Green's eyewitness testimony was critical to the success of the State's case.

At the time of trial and at the time of the events in question, Green was on probation by order of juvenile court after having been adjudicated a delinquent for burglarizing two cabins. Before any testimony was taken at trial, the prosecutor requested a protective order to prohibit any reference to Green's earlier adjudication or the fact that he was on probation. The trial judge granted the prosecutor's request, citing an Alaska statute which generally barred the admission of juvenile adjudications. Davis objected, contending that because Green was on probation for burglary and the safe was found near his home, Green would have a special motive to identify someone else in order to divert suspicion from himself. Davis' counsel also argued that simply being on probation made Green more vulnerable to police suggestion, and more obliging to the State.

Bound by the protective order, Davis' counsel nevertheless sought to disclose Green's state of mind at the time Green discovered that the stolen safe had been found near his home. Green claimed to be unconcerned that the safe had been found on his property, although he admitted it had crossed his mind that the police might think he had something to do with the crime. In the course of his cross-examination of Green, Davis' counsel also inquired about the police interrogation of Green. During the course of that line of questioning, Davis' counsel asked Green: "Had you ever been questioned like that before by any law enforcement officers?" Green replied, "No."

In holding that it was error to deny Davis the right to inquire into Green's prior adjudication and probationary status under these circumstances, the Supreme Court said:

Since defense counsel was prohibited from making inquiry as to the witness' being on probation under a juvenile

court adjudication, Green's protestations of unconcern over possible police suspicion that he might have had a part in the Polar Bar burglary and his categorical denial of ever having been the subject of any similar law-enforcement interrogation went unchallenged. The tension between the right of confrontation and the State's policy of protecting the witness with a juvenile record is particularly evident in the final answer given by the witness. Since it is probable that Green underwent some questioning by police when he was arrested for the burglaries on which his juvenile adjudication of delinquency rested, the answer can be regarded as highly suspect at the very least. The witness was in effect asserting, under protection of the trial court's ruling, a right to give a questionably truthful answer to a cross-examiner pursuing a relevant line of inquiry; it is doubtful whether the bold "No" answer would have been given by Green absent a belief that he was shielded from traditional cross-examination. It would be difficult to conceive of a situation more clearly illustrating the need for cross-examination.

*Id.* 415 U.S. at 313–14, 94 S.Ct. at 1108–09.

In the case before us, there was no suggestion that Melvin or Kelvin Brown had committed any offense for which the defendant was charged. Rather, the defendant wished to show that the meeting of the parties had to do with drug distribution, thereby bolstering, according to the defendant, his claim of reasonable fear of the Browns. The defendant argues that the probationary status of the witnesses gave them some additional reason to deny any involvement with drugs,[2] and thus evidence of their status should have been admitted. There is some merit in that

---

**2.** The defendant was able to elicit testimony from Ronald Brown that Fultz and Marshall were known to "hustle" drugs. Similarly, Melvin Brown testified that he knew Marshall "hustled" drugs, but he did not know whether Fultz did.

contention, and had the trial judge exercised his discretion to allow the evidence, that would not have constituted error.

After weighing the potential relevance of this information against the potential misuse of the evidence by the jurors in branding the witnesses with prior bad acts not otherwise admissible as bearing on credibility, and after considering that the jurors would understand that any witness would be reluctant to admit to illegal drug involvement because of the danger of being prosecuted for such involvement, and after assessing the potential collateral problems of explaining the underlying bases for the convictions that resulted in probations and the length of the suspended sentences so as to fairly judge the probable effect upon the witnesses, the trial judge could as well have determined, as he did, that under the circumstances of this case the limited probative value of the evidence was outweighed by other appropriate considerations. Accordingly, the trial judge did not abuse his discretion in this case by excluding evidence that the Brown twins were on probation.

### III.

Alternatively, any error in excluding evidence that the State's witnesses had been charged with a crime or were on probation was harmless beyond a reasonable doubt. The sole defense advanced by this defendant was self-defense. Even if the defendant had been able to prove that the meeting was drug-related, and that the events occurred just as he said they did, he would not have generated an issue of self-defense for consideration by the jury.

The defendant's version of the facts is that Marshall supplied drugs to Fultz, who sold them for Marshall's benefit. Earlier in the evening of the shooting, Fultz and Marshall had argued about the quality of crack cocaine Marshall had just delivered to Fultz—Fultz said the drugs were "bad" and that he had no intention of paying for them. The defendant interjected himself into a telephone conversation between the two, thereby irritating Fultz and one of

the Brown brothers. When the phone conversation ended, Marshall asked the defendant to accompany him to visit Fultz, apparently to collect the money Fultz owed Marshall for the drugs. Marshall drove. He carried a 38–caliber handgun in his belt, which the defendant saw. When they arrived in the neighborhood where Fultz "hustled" drugs, Marshall told the defendant to arm himself with a 32–caliber automatic weapon that he would find under the floor mat on the passenger side of the vehicle. Marshall said Fultz and his people "might have guns too." The defendant retrieved the weapon and placed it in his pocket. Marshall and the defendant then left the vehicle and went in search of Fultz. When they found Fultz, he was in the company of the three Brown brothers. Marshall and Fultz began a discussion about payment for the drugs. In response to questions by his counsel, the defendant described the succeeding events as follows:

Q: Sir, what happened then? What happened?

A: That's when I butted in and then that's when I think that was Melvin that butted in and then said I didn't have nothing to do with this. I said you're right, and then I said but, you know, you can get somebody to test the drugs. That's when Demetrius said what the fuck do I have to do with it. I said nothing. Then he said—then I said, I said—what did I say?

I said why don't you give the man back his drugs. He said, I told you you don't have a mother fucking thing to do with it.

Q: Who said that?

A: Demetrius. That's when they all started coming towards me. That's when Marlin put his hands up to say hold up, to stop the action. I took a couple steps back behind Marlin. They were still coming.

Q: When you took a couple of steps back, what happened?

A: That's when they were still approaching me.

Q: Who is they, sir?

A: Melvin, Kelvin, Ronald and Demetrius.

Q: What were you thinking at that time, sir?

A: They was going to hurt me.

Q: What did you do?

A: That's when I received from my pocket a gun and started shooting.

The defendant said he aimed the gun at one of the four men, pulled the trigger once, and fired five shots. He explained why he shot at them.

Q: Now, sir, why did you fire the gun?

A: Because I felt that they was going to hurt me.

Q: Why did you feel they were going to hurt you?

A: Because that's where Marlin told me they hustled at and I know from experience when people hustle that they normally carry weapons and stuff.

Q: Had you ever seen any of those other persons with weapons?

A: No. That was my first time seeing Kelvin, Ronald and Melvin.

The defendant stated that he had seen Fultz with a weapon on one prior occasion, when Fultz gave the weapon to Marshall. The defendant admitted he did not see any guns on the night in question, except those carried by Marshall and by the defendant.

In *State v. Faulkner*, 301 Md. 482, 485–86, 483 A.2d 759 (1984), this Court summarized the requirements that must be met in order to justify a homicide on the ground of self-defense:

(1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

The defendant's version of events is simply insufficient to show that at the time he fired his weapon he had reasonable grounds to believe himself in apparent imminent or immediate danger of serious bodily harm, or that the deadly force he employed was not excessive, but was reasonable and necessary under the circumstances.

The defendant said he was afraid that the Brown brothers, who were walking toward him, were going to hurt him because he had butted into a conversation that they felt was none of his business. No threats were made to the defendant, and no weapons were produced. Indeed Marshall, who was also armed, apparently did not feel it necessary to draw his weapon. Nevertheless, the defendant immediately pulled his gun and fired at Melvin Brown, striking him in the stomach or side, fired two shots into the back of Ronald Brown as he was attempting to run away, and fired additional shots which did not hit anyone. As a matter of law, this was not self-defense, i.e., a justifiable action exonerating the defendant from criminal liability.

Perhaps recognizing the weakness of his case for "perfect" self-defense, the defendant suggests that he at least generated a question of "imperfect" self-defense. *See State v. Faulkner, supra,* 301 Md. at 486–503, 483 A.2d 759 (generally discussing imperfect self-defense). That argument fails because the defense of imperfect self-defense does not apply to and is not available to mitigate any of the crimes of which the defendant was convicted.[3] Thus, any error in the exclusion of evidence offered to support a

---

**3.** In what may be a generous expansion of the law of self-defense, this Court has held that imperfect self-defense will serve to mitigate the offense of assault with intent to murder. *State v. Faulkner,* 301 Md. 482, 505, 483 A.2d 759 (1984). This Court has never held that imperfect self-defense applies to the offenses of which this defendant was convicted, namely unlawful shooting with intent to disable, use of a handgun in the commission of a felony, and battery.

nonexistent defense must be harmless beyond a reasonable doubt.

### JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

RODOWSKY, J., joins in Parts I and III of the opinion and concurs in the judgment of the Court.

ROBERT M. BELL, Judge, dissenting.

The majority affirms the judgment of the Court of Special Appeals which had earlier affirmed Eric Lorenzo Watkins' convictions of charges arising out of a shooting in Prince George's County. Initially, we are told that the trial court did not abuse its discretion when it limited the cross-examination of various State's witnesses regarding their probation status or criminal charges pending against them when the shootings occurred. Alternatively, the majority says, even if the court erred, it was harmless beyond a reasonable doubt. With the exception of the ruling with regard to victim Demetrius Fultz,[1] with which I agree, I disagree on both counts and, thus, respectfully dissent. Because, however, after reading the majority opinion, I am not sure that I recognize the issues as the ones that were briefed and argued, I'll address, in addition to the points made by the majority, the issues that the parties argued.

---

**1.** On cross-examination, Demetrius Fultz not only denied that he was armed at the time of the shootings, but he also denied that he carried a gun or had been arrested and charged with carrying one six days earlier. When defense counsel attempted to show the witness documents indicating that the witness had been charged with carrying a handgun, to which the witness had pled guilty, the jury was excused and the witness was *voir dired.* The *voir dire* confirmed that Fultz had, indeed, pled guilty to a handgun charge and been placed under court supervision. Thereafter, defense counsel was permitted to again ask Fultz whether he had possessed a handgun six days prior to the shooting. This time Fultz answered in the affirmative. Because Fultz was apparently a juvenile, but had been convicted as an adult, the court refused to allow the petitioner to introduce the charging document into evidence. Thus, despite the initial denial, the petitioner was permitted to elicit the admission he sought.

## I.

There were actually four victims of the shootings even though only two were actually shot. The State's case against the petitioner consisted of the testimony of each victim, as well as testimony from Marlin Marshall, the petitioner's friend, occasional roommate and co-defendant, who had negotiated a favorable plea agreement with the State.

The shootings occurred during an early morning encounter between, on the one hand, the petitioner and Marlin Marshall, and, on the other, Ronald Brown, twins Melvin and Kelvin Brown, and Demetrius "Tony" Fultz, the victims of the petitioner's assaultive acts. The State's theory of the case, as developed through its witnesses, was that the encounter was a chance one. Because the victims denied that drugs were involved in any way in the incident, the only conceivable basis for the petitioner's actions, it surmised, was his belief that one of the Brown brothers had been "talking trash" about him during an earlier telephone conversation between Marshall and Fultz.

The petitioner testified, on the other hand, that the meeting was planned. It was called, he said, to resolve a dispute over the quality of drugs he and Marshall had delivered to Fultz earlier that evening. He claimed that he acted in self-defense.[2]

According to the petitioner, Fultz "beeped" Marshall around midnight and, in response, Marshall telephoned him.

---

2. At oral argument, the petitioner suggested that, even if his actions were not such as to make out a case of "perfect" self-defense, the inquiry into the victims' pending criminal cases and/or probation status, was relevant to the determination whether he acted in "imperfect" self-defense. *See State v. Faulkner,* 301 Md. 482, 483 A.2d 759 (1984). Whether imperfect self-defense is a viable defense in non-homicide crimes other than assault with intent to murder is presently pending before this Court in *Richmond v. State,* No. 138, September Term, 1991, argued May 11, 1992. Because of that fact and also because the State does not challenge the applicability of imperfect self-defense to the factual situation *sub judice* and, in any event, the issue is not imperfect self-defense, I will not address that issue.

During that telephone call, the petitioner learned that Marshall and Fultz were arguing about the quality of the drugs Marshall had delivered. The petitioner asserted that he took the telephone from Marshall and spoke briefly to Fultz and then to one of the Brown brothers on the subject.

Following the telephone conversation, the petitioner testified that he and Marshall went to meet Fultz and, as it turned out, the Brown brothers, to discuss what was to be done. On the way, Marshall told him to take a gun from under the floor mat on the passenger side and carry it to the meeting. The petitioner maintained that he became frightened when it became apparent that no resolution of the problem was possible and the victims began to close in on him and Marshall. He stated that, at this point, he pulled the gun, an automatic, which he did not point at anyone in particular, and fired. Although he pulled the trigger only once, the gun fired several times. Melvin and Ronald Brown were hit.

After each of the four victims testified, the petitioner cross-examined him as to the cause of the shooting. Each denied that it was drug-related. Also, during the cross-examination of each victim, the petitioner sought to inquire into whether there were criminal charges pending against the witness or whether he was on probation. On each occasion, upon objection by the State, the court disallowed the inquiry.

The petitioner proffered that Ronald Brown had a pending theft charge which was set for trial in less than a month. Having been instructed by the trial court not to cross-examine him concerning that charge, the petitioner added: "I believe that I have a basis for thinking he may have been given some consideration in exchange for probation," to which the prosecutor responded: "Your Honor, of course, that is exculpatory evidence and I certainly would have told Mr. Roberts [defense counsel] any deals that I had made with anybody that is testifying." The court apparently accepted the prosecutor's representation as being dispositive.

During cross examination the petitioner proffered that Melvin Brown was on probation when the shooting occurred. He asked permission to cross-examine him on that subject. Notwithstanding an apparent reference to *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the court refused.

When the jury was released for the day, a further discussion ensued with respect to the propriety of the inquiry the petitioner sought to make concerning Melvin Brown's probationary status. After he was told by the court that he should inquire of the State whether it had made any "deals" with the witness with regard to probationary status, the following occurred:

> The Court: Mr. Roberts, the State told you when you came up and asked a question with respect to Ronald Brown that if the State had made any deals with any of its witnesses they would have told you prior to trial. If you care to ask the State on the record at this time whether or not it had made any deals with Melvin Brown that would affect ... his probation, you may do so, but other than that, then you're going to have to accept what the State has already told you in general. But I have no problems whatever with your asking the State whether or not any arrangements have been made with the State with respect to whether or not this man may have been on probation at that particular time.
>
> Mr. Roberts: Right. Well, I would ask the State to disclose if there is any arrangement. I didn't think there was one, but I did have reason to believe he was on probation and under Davis versus Alaska I thought that would be relevant to credibility.
>
> The Court: No, that is not a blanket. That is not—that case does not stand for that. If there's reason to believe that this person would think that were this person not to testify, then that probation might be revoked for some reason and they would be subject to some subsequent penalty, that's one thing. But there's nothing—testifying or not testifying doesn't do that.

Mr. Roberts: I think Davis versus Alaska held that a person on probation may want to conceal the truth with regard to a present offense so he wouldn't get in any further trouble with probation, and if these boys were involved in drug dealing and drug selling, that would be a reason why he would not want to tell the full truth.

The Court: Let me ask you something, did you ask him whether or not he had sold drugs?

Mr. Roberts: He denied that.

The Court: He denied it. If he had sold drugs and if he had told you he had, then he would be subject to a charge. It has nothing to do with probation. You could try him for it but, sir, it would be a confession. But, in any case, he has denied it straight up and down. Unless you have some reason to challenge that, then you're stuck with the answer.

The court thus restated its denial of the petitioner's request to cross-examine Melvin Brown concerning his probationary status.

The attempt to inquire into the probationary status of Kelvin Brown was met with the same response from the court. When the petitioner asked to be allowed to show that that status gave the witness a motive to deny that the cause of the shooting was a drug deal,[3] once again, the trial court denied the petitioner's request.[4]

---

3. The precise argument made by the petitioner's counsel was:
 Your Honor, I believe this witness was on probation at the time of this offense for the same reasons I enunciated yesterday. I believe it would be relevant to his credibility, tends to show he had a motive not to tell the complete truth with regard to this incident, particularly to—not to divulge the fact it was all over drugs, which I think is critical to this case.

4. The prosecutor suggested that she did not know if the representations were accurate since none of the witnesses had told her about prior convictions, arrests, or probations. The defense counsel, on the other hand, proffered that his basis of knowledge was the Brown brothers.

Evidence concerning the pending charges against Marshall and the plea agreement covering them was presented to the jury, *albeit,* not without some difficulty. As indicated, Marshall was initially charged as the petitioner's co-defendant. Prior to trial, however, he agreed to testify for the State and against the petitioner. He entered a plea of guilty to accessory after the fact to the shooting, for which, at the time of trial, he was awaiting sentencing. Notwithstanding the State's contention, expressed during opening statement and throughout its direct examination of Marshall, that Marshall "was given no deals for sentencing by the State," the petitioner's counsel was able to demonstrate to the court that, in fact, there was a plea agreement between the State and Marshall. He produced a letter from the trial prosecutor to Marshall's counsel, which set out the terms of the agreement:

> The co-defendant, Mr. Watkins, is certainly the most culpable, and to insure his conviction I propose the following plea offer: plead to count 19, accessory after the fact to a malicious shooting with the intent to disable. Order a PSI. The Defendant shall testify against Mr. Watkins. He shall meet with me to prepare this case before trial. In exchange for his cooperation and truthful testimony I will nol pros all remaining counts. Also I will recommend a sentence within guidelines, whatever they may be. The amount of suspended time and probation are to be within the Court's discretion.

The petitioner was permitted, thereafter, to cross-examine Marshall concerning whether, under his plea agreement with the State, Marshall expected a shorter sentence.[5]

---

5. Although he does not assign them as errors, the petitioner was not at all happy with the court's handling of his cross-examination of this witness. He complains that the court refused to allow the petitioner to cross-examine Marshall concerning the possible sentence he could have received had there been no plea agreement. In addition, the petitioner makes the point that the court never struck either the prosecutor's opening statement that there was no plea agreement or Marshall's initial denial that there was one.

## II.

A criminal defendant is guaranteed, by the Sixth Amendment to the United States Constitution, the right " 'to be confronted with the witnesses against him.' " *Davis v. Alaska*, 415 U.S. at 315, 94 S.Ct. at 1110, 39 L.Ed.2d at 353; *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 682–83 (1986). A criminal defendant in state court proceedings is guaranteed the same right by virtue of Article 21 of the Maryland Declaration of Rights. *See Tichnell v. State*, 290 Md. 43, 55, 427 A.2d 991, 997 (1981) (for confrontation purposes, Article 21 protects the same right as the sixth amendment); *Crawford v. State*, 282 Md. 210, 211, 383 A.2d 1097, 1098 (1978); *State v. Collins*, 265 Md. 70, 75, 288 A.2d 163, 166 (1972).

A primary right secured by the Confrontation Clause is the right of cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934, 937 (1965). Indeed, " '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " *Davis*, 415 U.S. at 315–16, 94 S.Ct. at 1110, 39 L.Ed.2d at 353 (quoting 5 J. Wigmore, *Evidence* § 1395, p. 123 (3d ed. 1940)). *See also Van Arsdall*, 475 U.S. at 678, 106 S.Ct. at 1435, 89 L.Ed.2d at 683.

The goal of cross-examination, "the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 353, is not only "to delve into the witness' story to test the witness' perceptions and memory, but ... to impeach, *i.e.*, discredit, the witness." *Id.* In addition to the more general attack on a witness' credibility, as, for instance, by cross-examining the witness as to prior convictions, "a more particular attack on witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 354. Such matters are " 'always relevant as discrediting the witness and affecting the

weight of his testimony.'" *Id.* (quoting 3A J. Wigmore, *Evidence* § 940, p. 775 (Chadbourn rev. 1970)). Thus, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1436, 89 L.Ed.2d at 684 (quoting *Davis,* 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 355). After all, "jurors [are] entitled to have the benefit of the defense theory before them so that they [can] make an informed judgment as to the weight to place on [the witness'] testimony which provide[s] 'a crucial link in the proof ... of the petitioner's act.'" *Davis,* 415 U.S. at 317, 94 S.Ct. at 1111, 39 L.Ed.2d at 354 (quoting *Douglas v. Alabama,* 380 U.S. at 419, 85 S.Ct. at 1077, 13 L.Ed.2d at 937).[6]

This is consistent with permitting a cross-examiner to question the witness "in order to determine the reasons for acts or statements referred to on direct examination." *Smallwood v. State,* 320 Md. 300, 307, 577 A.2d 356, 359 (1990) (citing *Cumberland and Westernport Transit Co. v. Metz,* 158 Md. 424, 149 A. 4, *reargument denied,* 158 Md. 424, 149 A. 565, *appeal dismissed sub nom, American Oil Company v. Metz,* 282 U.S. 801, 51 S.Ct. 40, 75 L.Ed. 720 (1930)).

Cross-examination for bias, and the like, is not, however, without restriction. We have recognized that " 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally rele-

---

6. In *Franklin v. State,* 239 Md. 645, 647, 212 A.2d 279, 281 (1965), this Court noted that cross-examination, in general, is an inherent element of the confrontation right.

vant.' " *Smallwood,* 320 Md. at 307, 577 A.2d at 359 (quoting *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435, 89 L.Ed.2d at 683). This means that cross-examination must not be permitted to stray into "collateral matters which will obscure the [trial] issues and lead to the fact finder's confusion." *State v. Cox,* 298 Md. 173, 178, 468 A.2d 319, 321, (1983). But that limitation does not apply until, and unless, the cross-examiner has reached his " 'constitutionally required threshold level of inquiry.' " *Smallwood,* 320 Md. at 307, 577 A.2d at 359 (quoting *Brown v. State,* 74 Md.App. 414, 419, 538 A.2d 317, 319 (1988)).

*Davis* and *Smallwood* are illustrative of the foregoing principles. In *Davis,* the issue was whether a defendant could cross-examine an important State's witness concerning that witness' probationary status as a juvenile delinquent for whatever bias it might reflect, when to allow impeachment on that basis conflicted with the State's interest in preserving the confidentiality of juvenile adjudications. There, the witness provided an important link in the State's case against the defendant; it placed the defendant, holding " 'something like a crowbar,' " and his blue Chevrolet sedan at the location where a stolen safe was recovered. *Davis,* 415 U.S. at 310, 94 S.Ct. at 1107, 39 L.Ed.2d at 350. When he made the identifications, as well as at the time of trial, the witness was on probation to the juvenile court for burglarizing two cabins. The defendant's proffer made clear that he intended to use that probationary status, not for a general impeachment of the witness' character, but

to show specifically that at the same time [the juvenile] was assisting the police in identifying the petitioner he was on probation for burglary. From this petitioner would seek to show—or at least argue—that [the juvenile] acted out of fear or concern of possible jeopardy to his probation. Not only might [he] have made a hasty and faulty identification of petitioner to shift suspicion away from himself as one who robbed the Polar Bar, but [the juvenile] might have been subject to undue pressure from the police and made his identifications under fear of

possible probation revocation. [The juvenile's] record would be revealed only as necessary to probe [him] for bias and prejudice and not generally to call [his] good character into question.

*Davis*, 415 U.S. at 311, 94 S.Ct. at 1108, 39 L.Ed.2d at 351.

Reversing the State Supreme Court, which had affirmed the trial court's restriction of cross-examination, the Supreme Court of the United States noted two possible bases for the defendant's claim of bias: the juvenile's probation status provided "a basis for an inference of undue pressure" on the juvenile to testify to avoid revocation and a possible concern on the part of the juvenile that he might be a suspect in the investigation. 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 354. The Court rejected the State Supreme Court's conclusion that the examination that was permitted was adequate, explaining:

[W]hile counsel was permitted to ask [the juvenile] *whether* he was biased, counsel was unable to make a record from which to argue *why* [he] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a "rehash" of prior cross-examination. On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.

*Davis*, 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 355.

The issue in *Smallwood* involved the extent to which an important State's witness could be cross-examined regarding the outcome of charges that the witness had previously lodged against the defendant. The witness, the defendant's former girlfriend, had charged the defendant with assault

on two prior occasions and, on each occasion, the defendant was acquitted. The defendant's theory was that it was her vindictiveness which caused the witness to testify against him. While the trial judge permitted him to question the witness about the charges, he was not allowed to question her about the disposition of the prior charges. The defendant claimed that the judge's ruling prevented him from revealing the full measure of Ms. Lomax's prejudice to the jury "so that the jurors could accurately weigh the witness's testimony." 320 Md. at 304, 577 A.2d at 358. We agreed, explaining:

> Petitioner maintained that the questions were asked in order to expose the witness's bias to the jury. Petitioner attempted to illustrate that Ms. Lomax had failed on two other occasions to have Petitioner convicted, and that she was using this opportunity to finally punish him for what she felt were unpunished wrongs committed against her in the past. Viewed in this light, we believe Petitioner should have been given the opportunity to further question the witness.

*Smallwood*, 320 Md. at 309, 577 A.2d at 360. We concluded that the questions in that case "went to the 'very heart' of Ms. Lomax's bias." 320 Md. at 310, 577 A.2d at 361 (quoting *Cox*, 298 Md. at 184, 468 A.2d at 324.)

## III.

As we have seen, the petitioner's defense was self-defense. That was premised upon the precipitating cause for the shootings being drug-related. The petitioner maintains he acted reasonably when he pulled the gun Marshall had given to him and fired. He had earlier delivered drugs which Fultz claimed were "bad," met with Fultz and his associates in the early morning, on Fultz's turf, was aware that drug dealers and their associates are notorious for carrying weapons, and became concerned for his safety only when the Brown brothers and Fultz started to converge on him and Marshall.

Although he suggested that it might be the case with respect to Ronald Brown's testimony, the petitioner's major premise was not that the State coerced the victims to testify for it, but that it was their connection with the criminal justice system, *i.e.*, the pending charges or probation status, and the risks of revocation or unfavorable treatment, that accounted for their lack of candor regarding the cause of the shootings. Accordingly, the focus of his inquiry, the petitioner asserts, was for the purpose of putting before the jury information on the basis of which the jury could infer that the victims' testimony lacked credibility or should be discounted.

I believe the trial court should have permitted the petitioner to cross-examine Ronald Brown about his pending charge and Melvin and Kelvin Brown about their probation status. That cross-examination would have placed before the jury information on the basis of which it could have accurately assessed those witnesses' testimony and, therefore, determined whether it was worthy of belief. Because in neither case was the petitioner permitted to make any inquiry into the pending charge nor the probation status, his constitutional threshold was never reached. Therefore, I believe the court erred.

Concerning Ronald Brown, cross-examination pertaining to the pending theft charge and whether he received, or expected to receive, any consideration from the State with respect to that charge for his cooperation with its prosecution of the petitioner, I believe, were certainly relevant to the credibility of the witness; it had a tendency to prove that the witness was biased in favor of the State because he hoped to receive favorable consideration as a result of his cooperation. Thus, it was a proper subject of cross-examination. By permitting the inquiry, the possible motivation for the testimony would have been presented. It is, after all, the witness' state of mind which is the crux of the relevant inquiry. *See Smallwood,* 320 Md. at 309, 577 A.2d at 360. The petitioner's defense was impaired when that cross-examination was not allowed. Attacking the witness'

credibility generally, which he could have done, does not suffice; without the ability to question the witness about the pending charge, the petitioner was unable to provide the jury with the basis for that attack. In other words, foreclosure of a more particular attack on credibility rendered the petitioner "unable to make a record from which to argue *why* [Ronald] might have been biased or otherwise lack that degree of impartiality expected of a witness at trial." *Davis*, 415 U.S. at 316, 94 S.Ct. at 1111, 39 L.Ed.2d at 355.

Similarly, the probation status of Melvin and Kelvin Brown was relevant to their credibility, *i.e.*, their bias in favor of the State. Its relevance lies in its tendency to afford the jury the opportunity to assess, in light of the defense interposed, the proper weight to be given the witnesses' testimony. Had the jury been aware of their probationary status, the petitioner would have been able to argue that Melvin and Kelvin Brown lied both at the time of the shooting and at trial in order to protect their probationary status. This could have told the jury why the witnesses were more likely than not biased in favor of the State.

The majority says that defense counsel accepted the prosecutor's statement that the State had not made a "deal" with Ronald Brown and acquiesced in the court's ruling. I do not agree. That the State, in response to the petitioner's effort to cross-examine Ronald Brown concerning his pending charge, advised the court that it would have informed the petitioner had there been a "deal" provides no basis for foreclosing the petitioner's right to cross-examine for bias. In the first place, it is the trier of fact, in this case, the jury, not the prosecutor or the trial judge, that must determine whether an attempt to show bias is either sufficient or insufficient. Second, and perhaps more significantly, that the State made an offer to induce the witness to testify, is not the only way to prove that a witness is biased. *See Smallwood*, 320 Md. at 310, 577 A.2d at 360; *Jorgensen v. State*, 80 Md.App. 595, 604, 565 A.2d 371, 375 (1989). It may be proven, as was attempted here, by showing that,

given the defense theory, the witnesses may suffer some detriment were they to be completely candid. Moreover, it is the state of mind of the witness—what the witness expects or hopes to gain as a result of his cooperation with the State—not whether there was an explicit deal on the table that is dispositive.

Nor does the record reflect acquiescence in the ruling. Once the court had ruled, there was nothing more for counsel to do but accept it. Maryland law does not require counsel to do more than object to preserve an objection. *See* Maryland Rule 4–323. Thus, where there is an objection timely interposed to evidence, a party does not acquiesce to a ruling unless the record clearly indicates that he has. Short of an explicit statement to that effect, it is difficult to imagine a scenario that would reflect such acquiescence. The statement he made here certainly is not sufficient.

The State's argument in this Court was that: "Watkins was accused solely of shooting offenses and was not charged with any drug offenses. Thus, any cross-examination of the witnesses regarding the existence of drugs or drug-related activities would not relate directly to the issues at hand in the case." Aside from the fact that the State, like the majority, reads *Davis* too narrowly—as pertaining only to concerns regarding identification or participation of the witness in the activity on trial—it misapprehends the thrust of the petitioner's point. The petitioner does not complain that his cross-examination of the witnesses about drugs or drug-related offenses was curtailed. He acknowledges that he was permitted to do that. Rather, the petitioner's complaint is that his attempts to question the witnesses about pending charges or probation status in light of the petitioner's contention that the shootings were the offshoot of drug-related activity were thwarted; it is the effect, in other words, of the pending charges or probationary status on the witnesses' willingness to tell the truth about their involvement in an illegal activity that is critical.

In that sense, therefore, the issue is *indistinguishable* from that resolved in the defendant's favor in *Davis*.

The foregoing also answers the State's charge that the subject of the petitioner's proposed cross-examination was ancillary to the issue being tried, thus, requiring the court to exercise its discretion to avoid collateral matters which would obscure the trial issues, perhaps to the fact finder's confusion. Moreover, in any event, performing the balancing test prescribed by *Smallwood*, limitation of cross-examination cannot appropriately occur until the constitutionally required threshold level of inquiry has been reached. 320 Md. at 307, 577 A.2d at 359. In this case, the court refused to permit any cross-examination concerning the pending charges or probation status of the Brown brothers. Consequently, the petitioner never reached the threshold level of inquiry. More to the point, however, the inquiry never reached the point of being harassing, prejudicial, confusing, repetitive, or only marginally relevant.

### IV.

I agree that a harmless error analysis must be made, but not the one made by the majority. Not even the State argues that the self-defense issue was not sufficiently generated to have constituted a jury question. Its first argument was that the drug issue was not really in the case and, hence, restricting cross-examination as to it was harmless. I have already responded to that argument. It also argued that the petitioner's admission that he committed the shootings was enough to constitute any cross-examination restriction in that regard, harmless error. That I will address after considering the majority's position.

### A.

It is not the province of an appellate court to find facts. That, however, is precisely what the majority does in this case. Whether the petitioner, when he fired the gun, had an honest belief that he was in imminent danger of serious

bodily harm, whether that belief was reasonable, or whether the force he used was excessive, are issues for the jury. *Dykes v. State*, 319 Md. 206, 224, 571 A.2d 1251, 1260–61 (1990); *Gore v. State*, 309 Md. 203, 214, 522 A.2d 1338, 1341 (1987); *Wilson v. State*, 261 Md. 551, 566, 276 A.2d 214, 221 (1971); *Jacobs v. State*, 238 Md. 648, 650, 210 A.2d 722, 723–24 (1965); *Ouzts v. State*, 225 Md. 540, 542, 171 A.2d 245, 247 (1961). The determination the majority makes, *i.e.* what evidence to believe and what weight to be given it, are precisely those which, on proper instructions, the trier of facts, in this case, the jury, is expected to make. That the trier of facts may ultimately reach the same conclusion that the majority does is beside the point. It must be allowed to make the determination in the first instance. I cannot agree with the majority's treatment of issues of fact as if they are issues of law, usurping once again the jury's function. *See Rubin v. State*, 325 Md. 552, 596–97, 602 A.2d 677, 698–99 (1992) (Bell, J., dissenting).

### B.

A decision to limit cross-examination of an adverse witness, or to deny it altogether, "does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." *Van Arsdall*, 475 U.S. at 682, 106 S.Ct. at 1437, 89 L.Ed.2d at 635; *Smallwood*, 320 Md. at 308, 577 A.2d at 359–60. *See also Collins v. State*, 318 Md. 269, 282, 568 A.2d 1, 7 (1990). When a restriction of cross-examination, or its total denial, has been determined to be error, the relevant inquiry becomes "whether, assuming that the damaging potential of the cross-examination were fully realized, ... the error was harmless beyond a reasonable doubt." 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 686. *See also Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976) (To hold an error harmless, an appellate court must be "satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.").

The strength of the State's case rested on the testimony of the victims as to whom cross-examination was limited. Had the petitioner been permitted to inquire into pending charges and probation status, the jury may have inferred that one or more of the witnesses had a reason to lie or, at least, to shade his testimony out of concern that his probation would be revoked or he would not receive favorable treatment in the disposition of the pending charge. Furthermore, the testimony of the other two State's witnesses was not so strong as to make the State's case overwhelming. Marshall, who had also pled guilty to being an accessory after the fact to the malicious shooting with intent to disable, had acknowledged testifying, significantly, with some reluctance, pursuant to a plea agreement.

Moreover, Fultz had, after initially denying it, confessed to having pled guilty to a gun possession charge some six days prior to the shooting. Thus, each of those witnesses had been impeached. Without the unimpeached testimony of the Brown brothers, the State's case was not nearly so strong. The need to discredit the Brown brothers, therefore, was really critical to the creation of a reasonable doubt in this case.

The State asserts that, in any event, because the petitioner admitted committing the shootings when he testified, there was no reasonable possibility that the evidence the cross-examination would have allowed, even if erroneously excluded, may have contributed to the finding of guilty. The admission that he committed the shootings does not end the inquiry. The petitioner's defense was that he acted in self-defense, the establishment of which depended upon his showing that the shootings were drug-related. The court limited his ability to show that the victim witnesses lied or shaded the truth about that critical fact; he was not permitted to bring to the jury's attention evidence concerning the witnesses' reasons for denying that the precipitating cause of the shootings was drug-related. It was that fact, which,

given the petitioner's defense, was most relevant and, indeed, pivotal, not the shootings themselves.

ELDRIDGE, J., joins in the views expressed herein.