732 A.2d 319

**Dagmar Ellen JENSEN**

v.

**STATE of Maryland.**

**No. 893, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

July 1, 1999.

Byron L. Warnken (James A. Lanier, Law Offices of Bonnie L. Warnken, Baltimore, Charles F. Lettow, Timothy A. Vogel, L. Burton Davis and Cleary, Gottlieb, Steen & Hamilton, Washington, DC, on the brief), for Appellant.

Regina Hollins Lewis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen, on the brief), Baltimore, for Appellee.

Argued before MOYLAN, SALMON, and THIEME, JJ.

SALMON, Judge.

On February 18, 1997, Theodore Daniels was murdered in his office in Woodlawn, Maryland. Dagmar E. Jensen, with whom Daniels had a business and romantic relationship, was arrested for the killing on March 27, 1997. She was tried from February 9 to February 11, 1998, before a jury in the Circuit Court for Baltimore County (Brennan, J., presiding). After the State presented its case, Ms. Jensen made a motion for judgment of acquittal that was denied. At the conclusion of the trial, the defense renewed its motion for acquittal, but the motion was again denied.

On February 17, 1998, the jury found Ms. Jensen guilty of the first degree murder of Daniels and the use of a handgun in the commission of a crime of violence. After appellant unsuccessfully made a motion for a new trial, the court sentenced

appellant to life in prison for the murder conviction and five years concurrent for the handgun offense. Appellant filed a timely appeal and raises two issues for our review:

1. Whether limited, wholly circumstantial evidence of criminal agency is sufficient to sustain a conviction when that evidence is entirely consistent with a reasonable theory of innocence.

2. Whether the erroneous admission of prejudicial bad acts evidence constitutes plain error when such evidence not only precludes a fair trial but, in light of the insufficiency of the evidence, is likely the "but for" reason that the jury rendered a guilty verdict.

## I. *TRIAL TESTIMONY*

Because the main issue in this case is whether the State presented sufficient evidence of Ms. Jensen's criminal agency, a detailed recitation of the circumstantial evidence against appellant is necessary.

### A. The Relationship Between Dagmar Jensen and the Victim

Theodore Daniels was 57 years old, six feet tall, and weighed approximately 179 pounds at the time of his death; appellant was 48 years old, five feet four inches tall, and weighed 140 pounds. Daniels was self-employed at the time of his death and operated an insurance business called Prepaid Legal Services, as well as other businesses. Appellant was associated with Daniels in his Prepaid Legal Services business.

The Maryland Motor Vehicle Administration listed Daniels's residence as a home he owned with his wife in Woodlawn. At the time of his death, however, Daniels was living with a girlfriend in Sparks, Maryland. He also maintained a residence at 5312 Wayne Avenue near his Woodlawn, Baltimore County, office. Appellant lived in a row home in Baltimore City; she shared the home with a man who rented the top floor from her.

Appellant first met Daniels in November 1996 while she was exploring the possibility of joining his Prepaid Legal Services operation. By the first or second week of January 1997, their relationship became sexual. Daniels told appellant that he was still married but had been separated from his wife for approximately twenty years. Appellant asked Daniels repeatedly about where he lived, but he evaded these questions by telling her that if she were patient she would eventually see where he lived. Daniels once took her to his house on Wayne Avenue, but this visit did not allay her suspicions that he actually lived elsewhere. Daniels never told appellant about his residence in Sparks, Maryland.

Russell Johnson, a business associate of Daniels, testified that he had known Daniels for over thirty years and that he and Daniels had started the Prepaid Legal Services business together. Through the business, Johnson met appellant. Appellant told Johnson that she was having a personal as well as business relationship with Daniels and that she was dissatisfied with information that Daniels was giving her regarding his personal life. Especially annoying to Ms. Jensen was the fact that Daniels would not tell her where he lived. Appellant telephoned Johnson on multiple occasions to ask him if he had seen Daniels, had any contact with him, or knew why Daniels had not called or seen her.

Johnson learned of a disagreement between appellant and Daniels that occurred on Sunday, February 16, 1997, which was two days prior to Daniels's death. On that date, Daniels asked Johnson to fill in for him on a radio program that the two hosted to promote their Prepaid Legal Services business. Daniels told Johnson that he was with appellant at the time and that the two were "trying to work out some things."

### B.   The Scene of the Murder

Daniels's corpse was found in his business office located on the second floor of a two-story office building at 2133 Gwynn Oak Avenue in Woodlawn, Maryland. The building contained five separate businesses. The first floor housed a motorcycle shop and the Woodlawn Beauty Salon. These businesses had

no direct access to the second floor of the building. Daniels's Prepaid Legal Services office, a civil process serving business, and the Something Sassy Hair Salon occupied the second floor. Access to the second story was limited to two entrances, one at street level at the front of the building and another at the top of a set of outdoor metal stairs located at the rear of the building. Both the front and rear entrances to the second floor had doors with deadbolt locks that required a key to unlock. One key operated both locks. Appellant did not have a key to the locks.

The front entrance to the building opened into a hallway that contained stairs leading to the second floor. The rear entrance was located next to a landing atop a metal staircase that led down to a parking lot behind the office building. The rear entrance had two doors—an unlocked aluminum storm door and a wooden interior door with a deadbolt lock. The interior door had three horizontal panes of glass in the upper half of the door. The lower border of the bottom pane was 38 inches above the landing. Each of the glass panes measured 11½ inches high by 22½ inches wide. The rear entrance opened directly into the common hallway shared by the businesses on the second floor of the building.

### C. Daniels's Last Hour and Events Leading to the Discovery of His Body

On Tuesday, February 18, 1997, at approximately 7:30 p.m., the owner of the Something Sassy Hair Salon and one of her employees were leaving after closing the salon. The salon was next to Daniels's office space, which had two rooms—Daniel's office and a conference room. Both the owner and the employee of the hair salon checked the rear entrance of the building to make sure that it was locked. They found that the rear door was locked and that the window panes were intact. The salon owner, hearing Daniels's television playing in his office, knocked on Daniels's door. Daniels answered, and the owner told him that she was closing up and asked whether he wanted the front door locked. Daniels said that he was expecting a visitor and that she should leave the front door

unlocked. When the salon owner and her employee left the building, they did not lock the front door.

On the evening of the murder, Theodore Daniels, Jr. (Daniels, Jr.), was driving home from evening classes at Morgan State University when he passed his father's office and noticed that the lights were on and his father's car was still parked in the rear parking lot. Thinking that his father was working, he decided to stop by for a visit. Daniels, Jr., could not be precise as to the time he arrived at the office except to say, "It had to be after 8:00." The front entrance was locked when he arrived so Daniels, Jr., used his own set of keys to enter the building. He then re-locked the front door. As he walked upstairs, Daniels, Jr., could hear that the television in his father's office was on at a very high volume. He arrived at the door to his father's office and found that it, too, was locked. He used one of his keys to unlock the office door and then found his father's body lying face down on the floor near the entrance. He turned his father's body over, called for emergency assistance, and attempted CPR, but the body was cold. He next heard the ambulance arrive so he went downstairs, unlocked the front door, and directed emergency personnel to his father's body.

At approximately 9:00 p.m., shortly after emergency personnel had arrived, police officers came to the scene and attempted to gain entrance to the building via the second floor back door. After ascending the rear stairs, these officers noticed that the pane of glass in the bottom window opening of the interior door had been broken,[1] that there were shards of glass lying on the floor both inside and outside the door (there was more glass on the exterior side of the door), and that there was blood smeared on the interior and exterior of the door and on the broken glass. The blood smears suggested

---

1. The broken window contained three to four inches of glass on the bottom left-hand side of the window frame. One of the responding officers described it as follows: "I observed that there was in the bottom left-hand corner a triangle shape of glass that still existed.... The rest had been cleanly knocked out. There were no splinters of glass there."

that someone had been cut by the broken glass. The blood smears were heavier on the exterior portion of the door. It also appeared to the officers, based on where the glass landed, that the glass was broken from the inside of the building while the storm door was closed.

Because the interior rear door was locked, the officers attempted to kick open the door. This action jarred additional glass out of the broken window pane that landed on the hallway floor. Daniels, Jr., hearing the commotion, went out into the hallway and unlocked the rear door. Once the officers confirmed that Daniels was dead, they cleared the premises and secured the crime scene.

### D. Evidence at the Crime Scene

When the officers arrived at Daniels's office, they found his body lying near his desk. His clothing was bloodstained. A pair of bent eyeglasses, containing a shattered lens, lay immediately to Daniels's right. A tennis ball, with signs of considerable damage, was further to the right of the eyeglasses. The tennis ball apparently had been used as a "silencer" to muffle the sound of a gun as it was fired. Bullet fragments were found embedded in the floor. The office telephone was lying near the body with the handset off the hook. Daniels's jacket was on a chair in the office. The jacket contained a set of keys to the building. Daniels was wearing a pager and had a twenty dollar bill in his pocket. Two televisions and a video cassette recorder were in the office but were left undisturbed.

Daniels had been shot four times with .38 caliber copper-jacketed, hollow-point bullets. All the bullets had been fired from the same weapon. Daniels had gunshot wounds to the neck, back, hip, and chest, with each bullet entering his body at a downward angle. Because no gunshot residue was found near any of the entry wounds, the medical examiner concluded that each shot was likely fired from a distance of more than three feet from the body. With respect to the gunshot wound to the chest, the bullet entered the body in a manner that suggested that it had passed through the tennis ball first.

Daniels had various lacerations on his face, as well as scrapes and abrasions on his nose and knees. The medical examiner testified that the most serious of these non-gunshot wounds was a laceration above Daniels's left eye that was consistent either with Daniels having been struck in the head with a blunt object or with the left side of his face having struck the floor causing his eyeglasses to break and cut his eyebrow. The medical examiner was unable to determine whether Daniels was seated, standing, or kneeling at the time he was shot.

### E.  Detective Duckworth's Investigation

Baltimore County Police Detective Milton Duckworth arrived at the crime scene at 9:48 p.m. to commence his investigation. Duckworth found no signs of forced entry or exit from the building (other than the broken glass from the back door), nor did he find any signs of ransacking or robbery. Samples of the blood from the door were collected for testing, and the door was processed for fingerprints. Fingerprints and palm prints were also collected from Daniels's office, including prints from the telephone next to the corpse and from papers located in the office. No murder weapon was recovered.

Several days after the murder, Detective Duckworth returned to the crime scene in an effort to develop leads from the victim's papers. Duckworth found a pink envelope in Daniels's mailbox that had not been in the mailbox on the night of the murder. The envelope contained a Valentine's day card that Daniels had sent to appellant. The card had been returned because it was addressed incorrectly. The card was signed, "Sincerely your latest." After finding the Valentine's Day card, Detective Duckworth contacted appellant to ask her what, if anything, she knew about Daniels's death.

### F.  What Appellant Told Detective Duckworth

Appellant first met with Duckworth on February 25, 1997, and informed him that she was a business associate of Daniels and also had been romantically involved with him. Appellant admitted that she had been sexually intimate with Daniels on

at least four occasions; some of their assignations had occurred at Daniels's office.

Appellant said that after their romantic relationship started he began to pay less attention to her. In December 1996, he failed to call her for approximately two weeks. This caused appellant to conclude that Daniels was still married and was lying to her about being separated from his wife.

Appellant told Duckworth that she contacted Russell Johnson to express her displeasure with Daniels. Thereafter, sometime in early January, Daniels finally contacted her and the relationship resumed.[2]

Appellant also told Duckworth that Daniels "had a secretive side to his life" and that this was starting to "piss her off." In this regard, appellant told Detective Duckworth that she had insisted at one point that Daniels take her to his residence, but he refused. Sometimes Daniels would telephone her and she would see the names of other women appear on her Caller Identification System monitor. This, too, upset appellant.

Appellant also told Detective Duckworth that she last saw Daniels two days prior to his death when the two had a Sunday morning breakfast together and later visited the Korean War Memorial in Baltimore. On that day, appellant repeatedly asked Daniels to show her his driver's license so that she could learn his true home address.

Appellant informed Detective Duckworth that she had plans to meet with Daniels at 7:00 p.m. on the date of his murder but did not keep the appointment because Daniels never called her to confirm the meeting. When asked about her whereabouts on the night Daniels was killed, appellant stated that she had visited a convenience store across the street from her home around 7:30 p.m.[3] and had spent the remainder of the

2. In her trial testimony, appellant said that she first became intimate with the victim during the first or second week of January 1997. In her statement to the police, she implied that her romantic relationship started in December 1996.

3. At trial, the defense called Margaret Hartley who testified that she owned a convenience store near appellant's home and that, on the

evening at home.[4]   At approximately 11:00 p.m. on the night of the killing, she left a voice mail message on Daniels's phone.

When appellant was arrested on March 27, 1997, her hands were placed behind her back and her wrists were handcuffed. According to Detective Duckworth, appellant "wanted to demonstrate her agility" and "to show me that she could slip out of" the handcuffs by putting her handcuffed hands in front of her.   Detective Duckworth did not allow appellant to demonstrate her ability in this regard.

## G.   Fingerprints

Five of the seventeen fingerprints recovered from the crime scene belonged to appellant.   All of appellant's fingerprints were located on the interior side of glass panes on the deadbolted rear entrance door.   One fingerprint in the office belonged to Daniels and one belonged to his son.   Of the ten remaining fingerprints, four were sufficiently intact for comparison, but the police were unable to find matches for these. Of the unmatched prints, two were recovered from interior glass panes of the rear door, one was recovered from the office telephone, and one was found on papers located in Daniels's office.

## H.   DNA Evidence

Appellant provided a blood sample to the police for DNA testing.   The sample was analyzed, and appellant's blood was found to be "consistent with" the blood that was found smeared on both sides of the rear door to Daniels's building. The probability that someone other than appellant was the

---

evening of the murder, appellant came into her store to return a videotape between the hours of 7 p.m. and 11 p.m. and that appellant appeared normal.

4.   Appellant was not asked what she was wearing on the night of the murder, nor was any clothing collected from her.   After her arrest, the police vacuumed the interior of appellant's car in search of glass fragments matching the broken window but, at the time of trial, the results of this analysis were still incomplete.

source of the blood was 1 in 8,200 among Caucasians and 1 in 170,000 among African–Americans. Appellant is Caucasian.

### I.  Appellant's Gun

During their first meeting, appellant informed Detective Duckworth that she had once owned a .38 caliber handgun but that burglars had stolen it from her house. The gun was purchased in late 1993; the burglary occurred on February 4, 1994. Duckworth investigated the matter and learned that appellant reported a 1994 burglary to the police in which a .38 caliber model 85 Taurus revolver was stolen along with some computer-related items. A firearms expert testified that the bullets found at the crime scene could have been fired from the type of gun that appellant reported stolen in 1994. He conceded, however, that a large number of firearms existed that could also have fired the fatal shots.

When the police searched appellant's house, they found the box for the Taurus handgun, bullets for the gun (these bullets were not the same type as used in Daniels's murder), and two computer monitors that appellant had reported stolen from her home when she reported the February 1994 burglary to the police.

### J.  Suicide Attempt

Seventeen days after Daniels's murder, on March 5, 1997, appellant attempted suicide. She left a suicide note on her computer that said:

I do not want to live anymore. I have not killed Ted and I have lied. I will go to jail and my prints are there and my blood is there. I did not kill him. There is something very strange going on. I do not want to live. I cannot take the pain of horrible things people do.

### K.  Appellant's Trial Testimony

Appellant admitted that, subsequent to reporting her .38 caliber gun and computer equipment missing, she found (in 1996) two of the computer monitors for which she had been paid by her insurer, but she did not report the recovery to the

insurance company or repay the money she had received for the monitors.

Appellant told the jury a different story regarding her alibi than what she had told Detective Duckworth one week after the crime. Although appellant still maintained that the last time she saw Daniels was two days prior to his murder, appellant admitted that her original statement to Detective Duckworth concerning her whereabouts on the evening of the murder was false. Appellant testified that she was scheduled to meet with Daniels at eight o'clock on the night of his murder. She expected, however, that he would call to confirm the meeting. Because she had not heard from Daniels, appellant left her home at approximately 8:00 p.m. and drove to Daniels's office. She arrived at approximately 8:20 p.m. and parked behind Daniels's building where she saw Daniels's car. She walked up the outdoor metal stairs to the rear entrance of the building. At the back door, she saw that one of the window panes in the door had been broken out; she heard a television playing loudly in Daniels's office and, after calling out for Daniels, she tried to open the interior door by reaching through the broken pane and attempting to turn the knob from the inside. As she stuck her hand through the broken window pane, she cut herself, leaving blood on the door and glass. Because the door had a deadbolt lock, appellant was unable to open it. She then left the premises and drove a short distance to Daniels's house on Wayne Avenue, but Daniels was not there. Ms. Jensen next went to her home at 843 South Kenwood Street, in Baltimore, Maryland. She later telephoned Daniels at approximately 11:00 p.m., leaving him a voice mail message.[5] In the message, she neglected to mention the fact that the rear door to his office had been broken.

Appellant was not alarmed by the broken door at Daniels's office, nor was she afraid that there might be a burglar inside.

---

5. Detective Duckworth testified that he attempted to gain access to Daniels's voice mail messages but did not do so because the phone company informed him that a federal wiretap order was required for that information. Because getting such an order would be too time consuming, Detective Duckworth opted not to retrieve the messages.

It did not occur to her to report a possible burglary attempt to the police even though she happened to see, while she was attempting to gain entry into the building, a police officer parked near Daniels's office. Appellant did not attempt to page Daniels while she was near his office because she believed (for reasons that she did not explain) that he would not have returned the call.

The day after the murder, Daniels's business associate, Russell Johnson, called appellant at work and informed her of Daniels's murder. Johnson said to her: "He's dead, did you do it Dagmar? I know you were arguing, did you do it?" Appellant's response to that question was not elicited at trial.

Appellant conceded that she did not tell Johnson that she had been to Daniels's office on the night of the murder, nor did she ever voluntarily contact the police to reveal this information.

Appellant testified that on other occasions when she visited Daniels's office, she usually entered through the back door— the door that was broken on the night of the murder. She last had sex with Daniels six days before he was killed. On that occasion she met him at his office and entered through the rear door, which Daniels opened with a key. According to appellant, while she enjoyed Daniels's company, she nevertheless had not been interested in a long-term commitment from him.

### L.   Other Defense Witnesses

At trial, Baltimore County Police Officer Jane Irwin testified that on the night of the murder, at approximately 8:15 p.m., she issued a ticket to a male motorist less than a quarter of a mile from Daniels's building. Officer Irwin originally pulled the motorist over because his taillight was not working, but later discovered that the vehicle was uninsured. After issuing the driver two tickets, she had the car towed. The driver was not arrested. Officer Irwin completed the towing and ticketing by 9:00 p.m. She heard the police call concerning Daniels's murder at about that time.

The defense also called a number of character witnesses who testified to appellant's good reputation for peacefulness.

## ANALYSIS

### ISSUE 1: Sufficiency of the Circumstantial Evidence

#### A. Standard of Review

The test for evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime, beyond a reasonable doubt. *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994). We examine whether the admissible evidence adduced at trial showed directly or supported a rational inference of the facts to be proved, from which the jury could be convinced, beyond a reasonable doubt, of the accused's guilt. *Thomas v. State,* 32 Md.App. 465, 476, 361 A.2d 138 (1976).

As long as there was legally sufficient evidence by which the jury could be convinced of the accused's guilt beyond a reasonable doubt, we will not disturb its verdict on appeal. *Wilson v. State,* 261 Md. 551, 556, 276 A.2d 214 (1971). In other words, a guilty verdict may be set aside only if there is no legally sufficient evidence or inferences drawable therefrom on which the jury could find the accused guilty beyond a reasonable doubt. *Barnes v. State,* 31 Md.App. 25, 29, 354 A.2d 499 (1976).

*Stouffer v. State,* 118 Md.App. 590, 605–06, 703 A.2d 861 (1997), *rev'd in part,* 352 Md. 97, 721 A.2d 207 (1998).

#### B. Circumstantial Evidence

"Maryland has long held that there is no difference between direct and circumstantial evidence." *Hebron v. State,* 331 Md. 219, 226, 627 A.2d 1029 (1993); *see Wilson v. State,* 319 Md. 530, 536, 573 A.2d 831 (1990). A conviction may be based on circumstantial evidence alone. If guilt is based on a single strand of circumstantial evidence, however, to meet the standard for legal sufficiency, the circumstances must be

inconsistent with any reasonable hypothesis of innocence.[6] *See Hebron*, 331 Md. at 224, 627 A.2d 1029; *Wilson*, 319 Md. at 537–38, 573 A.2d 831; *West v. State*, 312 Md. 197, 211–12, 539 A.2d 231 (1988). Nevertheless, the Court of Appeals has made clear that this last-mentioned rule does not apply when the conviction is based on multiple strands of circumstantial evidence. In *Hebron*, the Court explained:

> [W]here the circumstantial evidence consists of more than a single strand, . . . "an instruction requiring the exclusion of reasonable hypothesis of innocence is not only unwarranted, but improper." This is so because, in such a case, the circumstances, taken together and viewed from the State's perspective, are inconsistent with, although not absolutely dispositive of, the defendant's innocence.

*Id.* at 228, 627 A.2d 1029 (quoting *Hebron v. State*, 92 Md.App. 508, 515, 608 A.2d 1291 (1992)). Appellant contends that when faced with a sufficiency of the evidence claim:

> [T]he Court must determine (1) if the State's evidence is purely circumstantial, and, if so, (2) whether the circumstantial evidence is consistent with any reasonable theory of innocence. If it is consistent with any reasonable theory of innocence, the conviction must be reversed.

Appellant's contention is both misleading and incomplete in a case like the one at hand. As stated in *Hebron*, only where there is a single strand of circumstantial evidence does the

---

6. For instance, in cases such as *Pressley v. State*, 295 Md. 143, 147, 454 A.2d 347 (1983), where the only evidence of the defendant's criminal agency was his fingerprints found on a broken window of a basement office from which property had been stolen, the Court of Appeals ruled that the trial court should not have instructed the jury that they were "not required to be satisfied beyond a reasonable doubt as to each link in a chain of circumstances necessary to establish defendant's guilt." *Id.* at 146, 150, 454 A.2d 347. The Court said:

> In the peculiar circumstances of this case the instruction should not have been given because there was but one strand. This is so because there was no evidence other than the successive links of circumstantial evidence to connect the accused to the crime. *Lampitt* envisioned a case where the failure of a part of the circumstantial evidence would not remove an essential link. . . .

*Id.* at 150, 454 A.2d 347.

"reasonable hypothesis of innocence" rule apply. *See* 331 Md. at 229, 627 A.2d 1029. *See also Hagez v. State,* 110 Md.App. 194, 205, 676 A.2d 992 (1996). In *Stouffer,* we said:

> Robert M. Bell, currently the Chief Judge, speaking for the Court of Appeals in *Hebron* noted:
>
>> The cases referring to circumstantial evidence not excluding every reasonable hypothesis of a defendant's innocence are cases in which there is circumstantial evidence of the defendant's guilt and other evidence, either circumstantial or direct, tending to negate that evidence and no basis upon which a rational finder of fact could return a verdict of guilty without speculating as to which of the two versions is the correct version. A jury faced with that state of evidence could not logically nor lawfully, return a guilty verdict; hence as the Court of Special Appeals pointed out, given that scenario, "there is nothing for the jury to decide and, upon proper motion, the judge is duty-bound as a matter of law, to enter a judgment of acquittal."
>
> It should be noted that *Wilson[ v. State,* 319 Md. 530, 573 A.2d 831 (1990),] and *West[ v. State,* 312 Md. 197, 539 A.2d 231 (1988),] involved defendants who had access to stolen property and who attempted to cash a stolen money order, respectively. The Court of Appeals made clear that "critical to the resolution of both *Wilson* and *West* was the constitutional standard of review for sufficiency of the evidence." *Hebron,* 331 Md. at 231–32, 627 A.2d 1029. Moreover, the Court concluded that applying the reasonable hypothesis of innocence "is not only unwarranted, but improper" when the circumstantial evidence consists of more than a single strand because, in such case, the circumstances, taken in view from the State's perspective, are *inconsistent* with, although not absolutely dispositive of the defendant's innocence. *Id.* at 228, 627 A.2d 1029.

*Stouffer,* 118 Md.App. at 608, 703 A.2d 861.

The *Hebron* Court held:

[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand. . . . It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce absolute certainty in the minds of jurors. . . . While it must afford the basis for an inference of guilt beyond a reasonable doubt, it is not necessary that each circumstance, standing alone, be sufficient to establish guilt, but the circumstances are to be considered collectively.

*Id.* at 227, 627 A.2d 1029 (quoting *Gilmore v. State,* 263 Md. 268, 293, 283 A.2d 371 (1971), *vacated in part, Gilmore v. Maryland,* 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972)).

■ This is a case with multiple strands of circumstantial evidence; all the strands tie appellant to the murder. The State's evidence, if believed, showed that it is likely that the following transpired: (1) Sometime between 7:30 p.m. and 9:00 p.m. on the night of his death, Daniels let a visitor into his building, then locked the front door; (2) Daniels next unlocked his office door and escorted the visitor into his office, where the visitor turned up the volume of the television to block out the noise; (3) the visitor shot Daniels and next proceeded to the rear door but could not unlock it because Daniels had the key to the deadbolt lock; (4) the murderer kicked (or otherwise broke out) the window pane in the rear door; (5) as the glass was broken, most of the glass shards fell next to the closed storm door; (6) the murderer then crawled through the opening provided by the open window and, in doing so, was cut by glass shards still in the pane.[7]

Viewing the strands of circumstantial evidence as a whole and in the light most favorable to the State, the following was proven:

---

7.   It is unlikely that the killer both entered and exited from the rear door for at least three reasons: (1) this would not account for the front door being locked when Daniels, Jr. arrived; (2) breaking into the building would create a lot of noise, making it difficult to surprise the victim; (3) most of the broken glass was found on the exterior side of the rear door.

First, although it was not required to do so, the State established a possible motive for the murder. Appellant and Daniels were involved in a personal relationship. Appellant was angry at Daniels and that anger was fueled by jealousy because she believed that Daniels was lying about being separated from his wife and about where he lived. She was also angry because he was not paying enough attention to her and, she suspected, was romantically involved with others. Daniels was not only shot—he also suffered cuts and bruises, suggesting that the killer was angry at Daniels. Whoever committed the murder probably did not have robbery or theft as a motive because valuables were left in his office and on his person. Under these circumstances, the jury could infer that Daniels was killed for some personal, as opposed to a monetary, motive. Appellant possessed such a motive.

Second, appellant had the opportunity to kill Daniels. Daniels was killed sometime between 7:30 and 9:00 p.m. on February 18, 1997. Appellant was present at Daniels's building—according to her own admission—at approximately 8:20 p.m. on the evening of the murder.

Third, at 7:30 p.m., Daniels was expecting a visitor. Appellant had an appointment with Daniels at 8:00 p.m. It can be inferred that whoever killed Daniels probably was expected by him and that: (a) he let that person into the building and then locked the front door; and (b) he let that person into his office. Given the coincidence of the time of appellant's appointment and the time of his death, and appellant's blood on the rear door, it can also be legitimately inferred that it is more likely than not that appellant was Daniels's last visitor.

Fourth, the glass in the bottom window pane of the back door of Daniels's office building was intact at 7:30 p.m. at which time Daniels was still alive. Approximately an hour and a half later, the window was broken. As counsel for appellant admitted at oral argument, it is reasonable to conclude that the person who broke the rear window pane was the person who killed Daniels. It is also reasonable to conclude that the person who broke the window did not possess a key to the

building. Appellant's fingerprints were found on the interior side of the window panes to the rear entrance to the building. Her blood was found smeared on both sides of the rear wooden door. The glass in the rear door was mostly found on the exterior side of the deadbolted door. From this it can be inferred that a person without a key broke out the pane to get out of the building. Going through a 11½ inch high, 22½ inch wide window, thirty-eight inches off the ground at its lowest point, would take agility. Appellant was agile as demonstrated by the fact that she bragged that she could move her handcuffed hands from behind her back to her front. Even an agile person would likely be cut going through such a small opening. Appellant, by her own admission, was cut by the broken glass in the pane.

Fifth, Daniels was killed with a .38 caliber weapon, the same type of weapon that appellant had reported stolen in 1994. Some of the items that appellant reported stolen in 1994 were found in her home after the murder. Her story in regard to the 1994 burglary is difficult to believe. How could she mistakenly think that a thief had stolen two computer monitors if, in fact, they were still in the portion of the relatively small row house she occupied? Why keep the gun box and the bullets for a gun that had been missing for over three years? From this information, a rational trier of fact could conclude that appellant's .38 caliber handgun was never, in fact, stolen. And from this they could conclude that appellant had the means to commit the murder.

Finally, appellant lied to the police and others when—if she had been innocent—the truth would have better served her purposes. Appellant gave the police a false alibi when she said that after 7:30 p.m. on the night of the murder she was either at home or at a convenience store near her home. Although she admitted on the stand that she went to Daniels's office on the night of the murder, she never admitted this to anyone else prior to the trial. The jury was entitled to conclude that appellant also lied to Detective Duckworth when she told him that her appointment was at 7:00 p.m. rather than 8:00 p.m., as she later told the jury. Furthermore, when

faced with the fact that her fingerprints and blood were found at the crime scene, appellant attempted to commit suicide. Ofttimes people commit suicide—or attempt it—to punish themselves and to avoid embarrassment for a grievous misdeed. Attempting suicide only seventeen days after Daniels's murder and after she knew that her blood and fingerprints were near the crime scene and would incriminate her, could be viewed by a rational jury as an attempt to avoid the shame, hardship, and embarrassment that would inevitably accompany a murder conviction.

In addition to this circumstantial evidence, the jury had to weigh appellant's belated explanation for her fingerprints and blood being at the back door to Daniels's office. According to appellant, she went to look for Daniels at his office even though she did not have a definite appointment with him. She cut her hand on the already broken glass after receiving no response from Daniels, and left without alerting the police or anyone else of what would appear to most people to be—at least—a break-in attempt. A rational jury might conclude that it was unlikely that she was cut reaching in to try to unlock the door because she admitted that the hall lights on the second floor were on; if there were glass shards there, it seems likely that she should have seen the glass and avoided injury if she had merely reached through the open window. Moreover, a rational jury could conclude that if she cut herself as she says she did, it would be unlikely that blood would be found afterwards smeared on both sides of the wooden door and on the glass pane.

Although appellant's final version of what happened on the night of the murder is possible, many unlikely things in life are possible. The mere fact that there exists a "possibility" of appellant's innocence does not mean that the circumstantial evidence produced by the State was insufficient to convict for it "is not necessary that the circumstantial evidence exclude every possibility of the [appellant's] innocence...." *Hebron*, 331 Md. at 227, 627 A.2d 1029 (quoting *Gilmore*, 263 Md. at 293, 283 A.2d 371). Viewing the evidence as a whole, a rational jury could conclude that the circumstantial evidence

presented at trial was inconsistent with appellant's innocence and, accordingly, that evidence proved appellant's guilt beyond a reasonable doubt. Appellant cites *Wilson v. State,* 319 Md. 530, 573 A.2d 831 (1990), and *Warfield v. State,* 315 Md. 474, 554 A.2d 1238 (1989), as cases where the Court of Appeals reversed convictions based solely on circumstantial evidence. Appellant contends that "the circumstantial evidence of criminal agency is weaker [here] than that in either *Wilson* or *Warfield.*" We disagree. Appellant's blood and fingerprints near the scene of the murder, the turbulent relationship between appellant and the deceased, appellant's deceit and false alibi, and her attempted suicide all weigh heavily against her innocence.

In *Wilson,* a housekeeper was charged with theft of items from a bedroom in a house he was cleaning. *See* 319 Md. at 532, 573 A.2d 831. The only evidence that connected the defendant to the theft was that he had access to the room from which the items were stolen. *See id.* at 537, 573 A.2d 831. Based on this single strand of circumstantial evidence, the Court of Appeals held that a jury could not find, beyond a reasonable doubt, that the evidence was inconsistent with any reasonable hypothesis of the defendant's innocence. *See id.* at 538, 573 A.2d 831.

In *Warfield,* the defendant was seen exiting a garage from which a can of coins was later found to be missing. *See* 315 Md. at 479–80, 554 A.2d 1238. When asked about why he was in the garage, the defendant gave three different explanations. *See id.* Other than his presence at the scene of the crime and his multiple explanations for being in the garage, there was no other evidence connecting the defendant to the crime scene. *See id.* at 491–92, 554 A.2d 1238. Based on this limited circumstantial evidence, the Court of Appeals again held that it was insufficient to convict the defendant. *See id.*

In *Hebron,* as in *Wilson* and *Warfield,* the issue was whether circumstantial evidence was sufficient to convict. The defendant in *Hebron* was identified by witnesses as the driver of a car that was parked near the scene of the crime

just prior to a burglary. *See* 331 Md. at 221, 627 A.2d 1029. One witness saw the defendant park his car, walk between two buildings, and proceed in the direction of the victim's home; the witness then heard a loud "bash bang" noise. *See id.* at 222, 627 A.2d 1029. About twenty seconds later the witness saw the defendant emerge from between the buildings and drive away. *See id.* Aside from the issue of criminal agency, a question was raised as to whether the defendant had actually entered the victim's dwelling. *See id.* at 237, 627 A.2d 1029. The *Hebron* Court summarized the evidence in this regard and held:

No direct evidence was presented that the petitioner entered, or may have entered, the victim's home. No one saw the petitioner enter the premises and the testimony of the victim was that nothing was missing from her home. On the other hand, there was circumstantial evidence from which a rational trier of fact could conclude that entry had been made. That evidence consisted of the testimony concerning the condition of the door frame and the location of splinters and wood chips inside the house. As the Court of Special Appeals aptly explained:

That evidence, coupled with the loud bang heard by the neighbor and the fact that the frame was so damaged as to make it impossible to close and latch the door could lead a rational trier of fact reasonably to find that [the petitioner] used his body to batter the door with such force as to defeat the lock and open the door. From that, the trier of fact could further reasonably infer that, with the application of that kind of body pressure to the door, some part of [the petitioner's] body must necessarily have crossed the threshold when the door opened.

*Id.* at 238, 627 A.2d 1029 (quoting *Hebron,* 92 Md.App. at 511–12, 608 A.2d 1291).

The circumstantial evidence of guilt against appellant is as strong as that against the defendant in *Hebron.* And, as in *Hebron,* we conclude that the evidence in this case was sufficient to convince a rational jury that appellant was the criminal agent who shot Daniels.

## ISSUE 2: Admission of Prior Bad Acts

■ Appellant's final claim is that her conviction should be reversed because the trial court admitted prejudicial "bad acts" evidence when it allowed evidence that: (1) appellant's failure to advise her insurance company of the recovery of computer equipment that she had previously reported stolen; and (2) appellant's statement, at the time of her arrest, that she would be able to free herself from handcuffs even if she were handcuffed behind her back. Taking the handcuff evidence first, no objection was raised to this evidence in the trial court, and thus, this evidentiary question has not been properly preserved for appellate review. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court. . . ."). As for the evidence regarding the failure of appellant to notify her insurer of the recovery of some of the items allegedly stolen in the February 1994 burglary, this evidence was introduced by appellant—not by the State. Because appellant introduced this evidence, she cannot now complain about its admission.

■ Appellant nevertheless contends that her conviction should be reversed because the trial court committed "plain error" in admitting the aforementioned evidence. "[A]n appellate court may in its discretion in an exceptional case take cognizance of plain error even though the matter was not raised in the trial court." *Rubin v. State*, 325 Md. 552, 587, 602 A.2d 677 (1992) (quoting *Dempsey v. State*, 277 Md. 134, 141–42, 355 A.2d 455 (1976)). Although there is no "fixed formula" to determine when an appellate court should exercise its discretion to review unpreserved issues, the Court of Appeals in *Trimble v. State*, 300 Md. 387, 478 A.2d 1143 (1984), listed the following circumstances that would justify the exercise of plain error discretion:

"[W]e have characterized instances when an appellate court should take cognizance of unobjected to error as compelling, extraordinary, exceptional or fundamental to assure the defendant of fair trial." We further made clear that we

would intervene in those circumstances only when the error complained of was so material to the rights of the accused as to amount to the kind of prejudice which precluded an impartial trial.

*Id.* at 397, 478 A.2d 1143 (citing *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980)). An appellate court should review the materiality of the error in the context that it arose, giving due regard to whether the error was purely technical, the product of conscious design or trial tactics, or the result of bald inattention. *See Hutchinson,* 287 Md. at 203, 411 A.2d 1035.

█ The doctrine of "plain error" is not broad enough to apply to evidence introduced in the trial court by the appellant. If self-inflicted prejudice could result in reversal, no criminal trial could be safe from a "plain error" attack. Thus, there was no "plain error" in allowing appellant to introduce evidence that she had failed to tell her insurer that she had recovered some of the items previously reported stolen.

█ In regard to the evidence regarding appellant's statements about her ability to free herself from handcuffs, Maryland Rule 5–404(b) allows the introduction of prior acts of the defendant if such evidence is relevant and is not offered to show the defendant's propensity to commit crime.[8] Evidence concerning appellant's handcuffs statement was properly admitted. This evidence was not offered to prove that appellant had a propensity to commit crime or that she was a bad person. Its obvious purpose was to show that she possessed physical agility—the same type of agility required to wiggle through the small broken window opening, thirty-eight inches above the landing, at the rear of Daniels's office building.

---

**8.** Maryland Rule 5–404(b) reads:

*Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Thus, even if a proper objection had been made, the statement about the handcuffs would still have been properly admitted.

**JUDGMENT AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**