*Terance Johnson, Jr. v. State of Maryland*, Case No. 772, Sept. Term, 2024, and *Teriquo Lamont Johnson v. State of Maryland*, Case No. 881, Sept. Term, 2024, Opinion filed on April 2, 2026, by Berger, J.

CRIMINAL LAW – ASSAULT AND BATTERY – PROVOCATION

The defense of hot-blooded response to adequate provocation operates to negate malice in the homicide context, thereby mitigating a murder charge to manslaughter. The defense only applies to murder and crimes aligned with the essence of murder, such that an element of the subject crime could supplant the requisite malice of a murder charge. In *Christian v. State*, 405 Md. 306 (2008), the Court held that mitigation defenses, such as hot-blooded response to adequate provocation, are applicable to first-degree assault because, under *Roary v. State*, 385 Md. 217 (2005), such a charge could supply the malice necessary for a felony-murder charge if the victim dies. The Court, however, overruled *Roary* in *State v. Jones*, 451 Md. 680 (2017), holding that first-degree assault no longer supplies the malice necessary for felony murder. The defense of hot-blooded response to adequate provocation, therefore, is no longer available to defendants charged with first-degree assault.

CRIMINAL LAW – INSTRUCTIONS: NECESSITY, REQUISITES, AND SUFFICIENCY – FLIGHT OR SURRENDER

An instruction on flight is only properly given when there is some evidence from which the following four inferences can reasonably be drawn: (1) that the behavior of the defendant suggests flight; (2) that the flight suggests a consciousness of guilt; (3) that the consciousness of guilt is related to the crime charged or a closely related crime; and (4) that the consciousness of guilt of the crime charged suggests actual guilt of the crime charged or a closely related crime. Provided that there is some evidence from which these four inferences can be drawn, the question whether the circumstances constituted flight is properly left to the jury to decide.

CRIMINAL LAW – EVIDENCE – CIRCUMSTANTIAL EVIDENCE

Circumstantial evidence alone may sustain a conviction when such evidence supports rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused and such inferences rest upon more than mere speculation or conjecture.

REPORTED*

IN THE APPELLATE COURT

OF MARYLAND

No. 772

September Term, 2024

_____

TERANCE JOHNSON, JR.

v.

STATE OF MARYLAND

_____

No. 881

September Term, 2024

_____

TERIQUO LAMONT JOHNSON

v.

STATE OF MARYLAND

_____

Berger,
Friedman,
Robinson, Dennis M., Jr.
    (Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed: April 2, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case arises from an altercation outside of Frank's Den, a bar and liquor store in Glen Burnie, on March 12, 2023, that left Jamie Marshall-Bates ("Bates") with a traumatic brain injury. Appellants Terance Johnson, Jr. ("Terance") and Teriquo Johnson ("Teriquo") were tried by jury for various crimes stemming from the incident. During trial, and over the course of jury deliberations, significant dispute arose concerning whether the jury should be instructed on hot-blooded response to adequate provocation, mutual combat, and flight or concealment. Terance was convicted of first- and second-degree assault and reckless endangerment, and was sentenced to a total of 25 years, all but ten years suspended, followed by five years of supervised probation. Teriquo was convicted of second-degree assault, reckless endangerment, and rogue and vagabond, and was sentenced to a total of ten years, followed by five years of supervised probation. This consolidated appeal followed.

## QUESTIONS PRESENTED

Terance and Teriquo present four questions for our review, which we have recast and rephrased as follows:[1]

---

[1] Terance phrased his questions as follows:

1. Whether the evidence is insufficient for first-degree assault[.]

2. Whether responding "no" to the jury's question about hot blooded response being a defense to first-degree assault for Terance was an abuse of discretion[.]

In his brief, Terance also adopted Teriquo's arguments that the trial court abused its discretion by giving a flight instruction and withdrawing its mutual combat instruction.

I.    Whether the trial court abused its discretion by declining to instruct the jury on hot-blooded response to adequate provocation for Terance and mutual combat for Terance and Teriquo.

II.   Whether the trial court abused its discretion by instructing the jury on flight for Terance and Teriquo.

III.  Whether there was insufficient evidence to convict Terance of first-degree assault.

IV.   Whether there was insufficient evidence to convict Teriquo of "rogue and vagabond."

For the following reasons, we affirm.

-----

Teriquo phrased his questions as follows:

1.  Did the trial court abuse its discretion in instructing the jury on flight and concealment?

2.  Did the trial court abuse its discretion in withdrawing its jury instruction concerning mutual combat?

3.  Was the evidence legally insufficient to sustain the conviction for "rogue and vagabond"/ 4th-degree burglary?

4.  NOTICE OF INCORPORATION BY REFERENCE: Pursuant to Md. Rule 8-503(f), Appellant incorporates any and all arguments put forth in the brief of Terance Johnson, as they apply to Appellant's case.

2

*Frank's Den*

On March 12, 2023, appellants Terance and Teriquo[3] visited Frank's Den ("the bar"), a bar and liquor store on Crain Highway in Glen Burnie. Multiple surveillance cameras, without audio, inside and outside of the bar captured what transpired that evening.[4] Terance and Teriquo consumed a few drinks and interacted with numerous fellow patrons including Hilton Pulley ("Pulley") inside of the bar. Bates also visited the bar on March 12 and consumed at least one drink while there.

At approximately 10:56 p.m., Terance and Teriquo stood outside the bar when Bates came out and approached them. Bates said something to Terance and then backed away into the parking lot. Terance then grabbed a can of spray paint, walked towards Bates, and swung the can at him, but did not hit him. Simultaneously, Bates took a step back and Terance swung again, this time making at least minor contact with Bates's head. Bates, again, walked away but Terance and Teriquo followed. Meanwhile, Pulley walked out of the bar and approached Terance, Teriquo, and Bates.

---

[2] Because, as we shall explain, our review of the evidence is limited to whether there was "some evidence" of flight and whether there was sufficient evidence to sustain Terance and Teriquo's respective convictions of first-degree assault and rogue and vagabond, we frame the evidence here in the light most favorable to the State. In so doing, we draw any "reasonable inferences deducible from the evidence in a light most favorable to the State." *Smith v. State*, 415 Md. 174, 186 (2010) (citation omitted).

[3] For clarity, we refer to the appellants, who are brothers, by first name.

[4] The co-defendants stipulated as to who they were in the videos.

Thereafter, Terance continued to approach Bates who backed away near a white sedan in the parking lot. Terance swung the can of spray paint at Bates again and Bates ducked, backing away along the side of the white sedan. Terance then turned around and started to walk away from Bates, at which point Bates opened the driver's side door of the white sedan. As Bates opened the vehicle's door, Terance walked towards him again, followed by Teriquo, then Pulley. Bates backed up, and Terance followed him into the parking lot and around the side of another vehicle two parking spots down from the white sedan. While Terance followed Bates, Teriquo opened the door to the white sedan and reached inside. Teriquo rummaged around the vehicle with the front half of his body inside for a few seconds.

While Teriquo was rummaging through the white sedan, Terance swung at Bates again, either missing or grazing him. At approximately 10:58 p.m., Bates punched Terance, who immediately fell to the ground. Bates proceeded to punch Terance for approximately five seconds before Pulley ran over and pulled Bates away from Terance. At the same time, Teriquo -- apparently realizing what was going on -- got out of the white sedan and rushed over to Pulley and Bates. Teriquo wrapped his arm around Bates from behind. Teriquo then pulled Bates, who was flailing, towards the corner of the building.[5]

---

[5] The corner of the building to which Teriquo pulled Bates is outside of the view of the bar's outside surveillance cameras. At approximately 10:59 p.m., however, Bates's foot comes into view. Viewing this (as well as subsequent instances captured on the surveillance camera) in the light most favorable to the State, we adopt the reasonable inference that, although out of view of the surveillance camera, Bates did in fact remain at the corner of the building from this point to when paramedics arrived.

While Teriquo and Bates were outside of the surveillance camera's view, Pulley walked over to Terance to help him up. At approximately 11:00 p.m., another individual walked to the corner of the building and pulled Teriquo away from Bates. With a few onlookers now watching, Teriquo walked away from Bates and back towards Terance and Pulley. Less than a minute later, however, Teriquo walked back to Bates and made a few kicking or stomping motions towards him. Seconds later, Pulley rushed toward Teriquo. Terance, unsteady and stumbling, followed behind. Pulley quickly pulled Teriquo away from Bates while Terance made a stomping motion in Bates's direction.

Thereafter, Pulley assisted Terance to a vehicle parked on the opposite side of the parking lot and Teriquo followed. Once Teriquo and Terance entered their vehicle, Pulley walked back across the parking lot to Bates. At approximately 11:02:38 p.m.,[6] Teriquo and Terance's vehicle -- driven by Teriquo -- began moving in the direction of the corner of the building where Pulley and others gathered near Bates. The vehicle passed an exit from the bar's parking lot to Crain Highway and, at approximately 11:02:45 p.m., Teriquo drove the vehicle around the side of the bar where Pulley and others were standing, checking on Bates. Teriquo drove the vehicle close enough to where Bates, Pulley, and others were, that one of the onlookers jogged away and returned only after the vehicle was gone.

At approximately 11:03 p.m., someone in the bar's parking lot called 911 to report finding Bates, breathing but unresponsive, on the ground outside of the bar. At

---

[6] For clarity, we extend the time to the second in instances when developments unfolded quickly.

approximately 11:08 p.m., paramedics arrived on the scene and noticed shortly thereafter that Bates had sustained head trauma, including bruising, swelling, and bleeding on his face. Bates was transferred to a shock trauma unit in Baltimore where medical professionals determined he had suffered a traumatic brain injury and diagnosed him with a subdural hematoma.

The State charged Terance, Teriquo, and Pulley with attempted first- and second-degree murder, conspiracy to commit first-degree murder, conspiracy to commit first-degree assault, first- and second-degree assault, and reckless endangerment. Teriquo was additionally charged with "rogue and vagabond."

***The Trial***

The trial court granted the State's joinder motion to try Terance, Teriquo, and Pulley together.[7] The State's case relied principally on the bar's surveillance video, which was shown to the jury. Bates testified at trial that he was able to identify himself in the surveillance video but could not recall being at Frank's Den on March 12, ever interacting with the co-defendants, or how he sustained his injuries. None of the co-defendants testified at trial.

At the close of the State's case in chief, Terance and Teriquo moved for judgment of acquittal on all charges. The trial court granted Terance's motion for judgment of acquittal with respect to the attempted first- and second-degree murder and conspiracy to commit first-degree murder charges. The trial court explained that, in its view, the State

---

[7] Pulley is not a party to this appeal. Accordingly, we do not discuss the charges lodged against him further.

failed to provide sufficient evidence to prove that Terance "could have [had] the requisite mens rea beyond a reasonable doubt to have attempted to kill . . . Bates even including that final return at the end of the sort of episode as it were because it's not clear what conduct he engages in." The trial court elaborated:

> Certainly, the jury could speculate that [Terance] too was attempting to stomp a person who's incapacitated, but that would be speculative and the Court has to determine whether that's evidence alone, that if the jury were to say return a verdict of guilty how they could have reached that conclusion beyond a reasonable doubt as it pertains to an intent to kill an individual. And the Court find [sic] that that has not been presented sufficiently.

The trial court denied Terance's motion for judgment of acquittal with respect to the first- and second-degree assault, reckless endangerment, and conspiracy to commit first-degree assault charges, reasoning that

> a jury could conclude that coming over and committing any assaultive behavior on someone who is incapacitated could place someone in jeopardy of serious physical injury. And that's one theory by which assault the [sic] first degree can be completed and I guess the principal theory as it pertains to [Terance].

The trial court granted Teriquo's motion for judgment of acquittal with respect to the conspiracy to commit first-degree murder charge but denied it as to the remaining charges. Concerning the rogue and vagabond charge, the trial court explained

> while I agree . . . that there's nothing directly that showed that the vehicle belonged to [] Bates, I do think there's ample circumstantial evidence, namely in the form of the video of an individual repeatedly trying to get to that car, and then certainly all the arguments that [Teriquo's counsel] made in advocating for his motion for judgment of acquittal are appropriately recycled to the jury in the closing argument.

7

But in this context, I find that under motion for judgment of acquittal that a prima facia [sic] case has been established by the actions of [] Bates as they appear on the video.

At the close of evidence, Terance renewed his motion for judgment of acquittal on the remaining charges. The trial court denied the motion "for all the same reasons" it had stated before. Teriquo similarly renewed his motion for judgment of acquittal on the remaining charges. The trial court denied Teriquo's renewed motion, finding there was sufficient evidence for a reasonable jury to convict him of rogue and vagabond.

*Jury Instructions*

At the initial charging conference, the trial court reviewed a list of proposed jury instructions, which included instructions on flight or concealment ("flight instruction"), hot-blooded response to adequate provocation,[8] and mutual combat.

Teriquo objected to the flight instruction, arguing that no one had alleged flight or concealment. Pulley argued that, while the instruction did not apply to him, such an instruction was proper for Terance and Teriquo because "it's very clear that the Johnson brothers left the scene, they fled." Teriquo countered that "[t]hey didn't flee, they left. The fight was over, they were done, they went home. There is no, there's no flight like, gosh, you know, the police are coming. There's none of that, right? There's no, I'm running from the police. There's no, there's no concealment." Terance argued that the instruction

---

[8] The record refers to this defense interchangeably as "hot-blooded response to legally adequate provocation," "hot-blooded response," and "heat of passion." We shall use the terms "hot-blooded response to adequate provocation" and "hot-blooded response."

8

could not apply to him because it was not clear that he had the requisite consciousness of guilt to flee. The State contended that a flight instruction should apply to all three defendants. The trial court granted the instruction, explaining:

> Well, points are well taken, but the Court will give it -- at least one defendant's asking for it, State's asked for it, but more than that I think that the pattern of instruction properly describes to the jury what weight, if anything, they give to flight and how they can determine whether it's flight or simply normal exit, so to speak.

Next, Teriquo requested an instruction on the defense of hot-blooded response to adequate provocation. Teriquo argued that such an instruction was generated because it was Terance -- his brother -- that Bates knocked out, providing sufficient provocation. The trial court concluded that "it's clear now after *Christian* [*v. State*, 405 Md. 306 (2008)] that [hot-blooded response to adequate provocation] applies to assault first degree as well." The State opposed giving the instruction, arguing there was no "evidence of provocation on the part of the victim." Terance chimed in stating

> I disagree wholeheartedly with [the State]. There is evidence that in terms of the actions of the . . . victim in this case . . . he's in the bar by himself, he voluntarily goes outside the bar.

> And what you see on the video is that he is intentionally engaging with [Terance], absolutely intentionally engaging. And then to say he's done nothing to result in some sort of reaction is ridiculous. It's on the video that [Terance] turns his head and he is sucker punched and then smashed into the ground and pummeled on the ground.

The trial court granted the instruction, reasoning that

> [t]here's an argument to be made that gives rise to the instruction and I think [Teriquo] hit on that. . . .

9

And so, the argument, I think as I hear from Counsel, is that the multiple strikes on the ground, maybe not the first one, although I'm not sure they would conceive that, but may have been what insighted [sic] the heat of passion.

Finally, Teriquo requested an instruction on mutual combat based on Bates "do[ing] the aggressive thing when he chested up and then beat -- and then started banging up on him[.]" The trial court delayed ruling on whether such an instruction was generated until counsel drafted a non-pattern instruction on the defense.

Among the instructions the trial court subsequently read to the jury were a flight instruction applying to all three defendants, a hot-blooded response instruction applying to Teriquo, and a mutual combat instruction applying to Teriquo. Terance and Teriquo both excepted to the flight instruction. Terance excepted to the mutual combat instruction, arguing that it should also apply to him based on his interaction with Bates before Bates knocked him out. The trial court expressed doubt as to whether the mutual combat instruction applied to either Terance or Teriquo:

> I'm not getting the mutual combat instruction for a couple of reasons. Number one, I don't find that the theory of the case applies to the facts that I've seen in the video. I don't find there's a reasonable application of mutual combat with the two elements based on the nature of the fact that in the second instance where [] Terance [] is seen approaching [Bates], that can never fall under the context of mutual combat.
>
> . . .
>
> And then conversely, in the two punches or swings that I think were best described as grazing or misses, in those cases, the victim appeared to be retreating. . . . [I]n addition to that, I've been provided a copy of mutual combat that still doesn't lay out who carries the burden of proof and whether there's a

10

> burden-shifting interpretation of that. . . . And I find that counsel would have had to have researched that and presented it in a way that I can be confident that that's the proper application of the burden of proof.

The trial court elected to withdraw the mutual combat instruction and instructed the jury not to consider it. The jury received a copy of the instructions during deliberations which included a parenthetical for each instruction noting to which defendants it applied.

### *Jury Deliberations and Verdict*

While the jury was deliberating, it sent the trial court two questions that are relevant here. First, the jury asked:

> On pg 13 in reference to First Degree Assault (Hot Blooded Response) factor #2 states that "the only act that you can find . . . is a fight between the victim and the defendant." Are we only considering Teriquo Johnson in this factor as the only defendant? (does the fight need to be between those two?) Also, does this consideration only apply to Teriquo? Some of the jurors are concerned that it could also be considered for Terance. Thank you!

After discussing the note with counsel, the trial court responded that "[t]his defense generally applies only to Teriquo Johnson. However, a substantial battery upon the defendant or a close relative may constitute legally adequate provocation."

Second, and shortly after the first note, the jury asked: "can the hot blooded defense be applied to Terence [sic] Johnson if not listed in the instructions?" Terance's counsel argued that the trial court should respond in the affirmative, reasoning that "if the jury believes that sufficient evidence was to generate so much that they asked in a note that it should apply because the jury has spoken, and hot-blooded response is available to my client." The trial court expressed doubt about what, if any, evidence gave rise to the

11

instruction.  In the trial court's view, the only event that could have given rise to Terance's purported hot-blooded response was the fight between Teriquo and Bates, and Terance was "knocked out" for most of it.  Terance's counsel countered that the jury could have been considering the battery of Terance by Bates as adequate provocation to warrant mitigation.  The trial court was unpersuaded because there was too much attenuation between Terance being knocked out and his subsequent rejoining of the fight.  The trial court noted that its

> view of the evidence is that it would cause confusion, mislead the jury.  It absolutely applies to Teriquo [] in this context, because he witnessed his brother getting hit, but I think it invites confusion.  It might actually (unintelligible) the defense as it applies to Teriquo [] and would be giving it in a way that I don't think has any reasonable or fair interpretation of the evidence.

The trial court responded "[n]o" to the jury's note.

Subsequently, the jury returned a verdict convicting Terance of first- and second-degree assault, and reckless endangerment.  Teriquo was convicted of second-degree assault, reckless endangerment, and rogue and vagabond.  Terance and Teriquo both noted a timely appeal.   We shall provide additional facts in our forthcoming discussion as necessary.

12

## DISCUSSION

**I.** **The trial court did not abuse its discretion by declining to instruct the jury on hot-blooded response to adequate provocation for Terance or mutual combat for Terance and Teriquo because neither mitigation defense applies to first- or second-degree assault.**

On appeal, appellants[9] argue that the trial court abused its discretion by declining to instruct the jury on two mitigation defenses. First, Terance contends that the trial court committed reversible error when it answered the jury's question concerning whether hot-blooded response to adequate provocation applied to his first-degree assault charge in the negative.[10] According to Terance, evidence that Bates knocked him out was sufficient to generate a hot-blooded response instruction. As a result, the trial court was required to answer the jury's question in the affirmative. Second, appellants contend that the trial court abused its discretion by withdrawing the requested mutual combat instruction. Appellants reason that there was "some evidence" that appellants and Bates shared a mutual intent to fight; the instruction, therefore, was generated. Further, appellants maintain that, to the extent the requested instruction was incorrect as to the allocation of the burden of proof, the trial court bore the burden of propounding a correct instruction because the mutual combat instruction requested was relevant and raised an arguable defense. The State

---

[9] Some issues raised on appeal apply singularly to one appellant or the other, while others apply to both appellants. For issues that apply to both appellants, we shall refer to Terance and Teriquo collectively as "appellants."

[10] In his brief, which was filed prior to Terance's, Teriquo "incorporate[d] all additional arguments raised in the brief of Terance [], to the extent applicable to this appeal." As the State correctly points out, because Teriquo was not convicted of first-degree assault, this issue is inapplicable to his appeal.

13

counters that after the Supreme Court of Maryland's decision in *State v. Jones*, 451 Md. 680 (2017), neither defense applies to the charges at issue, and therefore, the trial court did not abuse its discretion by omitting such instructions.[11] As we shall explain, we agree with State.

Although we review a trial court's decision to decline to give a requested jury instruction for abuse of discretion, whether a requested instruction is applicable to the facts of the case is a question of law, which we review *de novo*. *Bazzle v. State*, 426 Md. 541, 550 (2012). Whether the trial court abused its discretion by declining to give the two instructions at issue here depends on a broader, and unsettled, question: whether hot-blooded response to adequate provocation is applicable to first- or second-degree assault.[12]

## A.     The defense of hot-blooded response to adequate provocation

We begin our analysis by examining the general requirements of hot-blooded response to adequate provocation and mutual combat. The "phenomenon of mitigation"

---

[11] The State offers an alternative argument that there was insufficient evidence to generate either a hot-blooded response to adequate provocation instruction for Terance or a mutual combat instruction for Terance and Teriquo. Because we conclude that neither instruction was applicable, we need not address whether there was sufficient evidence to generate such instructions.

[12] In an apparent preservation argument, the State suggests that Terance failed to request an instruction on either hot-blooded response to adequate provocation or mutual combat. We are not persuaded. Terance made an express, albeit delayed, request to be included in the mutual combat instruction after the question of the proper allocation of the burden of proof was raised. Further, to the extent Terance did not explicitly ask to be included in the hot-blooded response instruction prior to the jury's deliberations, we are satisfied that the issue is properly before us. To be sure, Terance clearly requested that the jury be instructed that the hot-blooded response defense applied to him when the trial court received the jury's second note. Accordingly, we address the merits as to both defenses.

14

has historically been "limited to criminal homicide and its shadow forms," such as attempted murder. *Richmond v. State*, 330 Md. 223, 233 (1993), *abrogated by*, *Christian v. State*, 405 Md. 306 (2008) (citation omitted). Hot-blooded response to adequate provocation is one such mitigation defense, and "typically involves passion-creating circumstances, those to which the rule of provocation applies." *Christian*, 405 Md. at 322 (citing *Girouard v. State*, 321 Md. 532, 538 (1991)). To invoke the defense of provocation, four elements must be met:

1. There must have been adequate provocation;

2. The killing must have been in the heat of passion;

3. It must have been a sudden heat of passion -- that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool; [and]

4. There must have been a causal connection between the provocation, the passion, and the fatal act.

*Girouard*, 321 Md. at 539 (citation omitted). "For provocation to be 'adequate,' it must be 'calculated to inflame the passion of a reasonable [person] and tend to cause [them] to act for the moment from passion rather than reason.'" *Id.* (quoting *Carter v. State*, 66 Md. App. 567, 572 (1986)).

The Supreme Court of Maryland has recognized that hot-blooded response may be raised in cases involving mutual combat, "assault and battery, . . . , resisting an illegal arrest, witnessing, or being aware of, an act causing injury to a relative or a third party, and anything the natural tendency of which is to produce passion in ordinary [people]." *Christian*, 405 Md. at 323 (citing *Girouard*, 321 Md. at 538). We have explained what

15

constitutes mutual combat as follows:

> The combat is mutual if the intent to fight is mutual, and in such situations the question of which one actually strikes the blow is not controlling. In fact, if both intend to fight and are ready to do so it may be a 'mutual combat' although one party did not actually strike any blow.

*Whitehead v. State*, 9 Md. App. 7, 11 (1970) (citation omitted). Because mutual combat is merely one variety of adequate provocation which may form the basis of a hot-blooded response defense, the question of whether the trial court abused its discretion by withdrawing the mutual combat instruction turns on whether hot-blooded response is a defense available to criminal defendants charged with assault.

**B. The evolution of hot-blooded response to adequate provocation's application to assault**

We now examine the historical application of hot-blooded response to adequate provocation. Hot-blooded response is a mitigation defense; that is, it is the "heat of blood," which was aroused by adequate provocation that operates to negate malice, thereby mitigating a murder charge to manslaughter. *See, e.g.*, *Girouard*, 321 Md. at 538 ("[T]he difference between murder and manslaughter is the presence or absence of malice."); *Whitehead*, 9 Md. App. at 11 (citation omitted). The Court has explained that malice "is a chameleonic term, taking on different meanings according to the context in which it is used." *Richmond*, 330 Md. at 231. It is only in the context of murder cases that "the absence of legally adequate justification, excuse, or circumstances of mitigation" is part and parcel of "malice." *Id.* (citing *Ross v. State*, 308 Md. 337, 340 n.1 (1987)). In "cases not involving murder," on the other hand, "malice does not involve proof of the absence of

16

mitigation." *Id.*

Following this reasoning, the application of mitigation defenses such as hot-blooded response to adequate provocation has been expanded only to "shadow forms" of homicide; that is crimes "aligned with the essence of murder," such that an element of the subject crime could supplant the requisite malice of a murder charge. *Christian*, 405 Md. at 325 (2008) ("Where the essence of an assault is aligned with the essence of a murder, this Court has further recognized imperfect self-defense as a proper defense to the statutory crime of assault with intent to murder."); *see also Webb v. State*, 201 Md. 158, 161 (1952) (holding that hot-blooded response is a defense to assault with intent to murder, a crime that requires "proof of both an assault and an intention to murder").

Notably, however, where a crime is unlinked to malice in the murder context, the Court has historically held that mitigation defenses do not apply. *See Watkins v. State*, 328 Md. 95, 106 (1992), *overruled on other grounds by*, *Calloway v. State*, 414 Md. 616 (2010) (holding that "the defense of imperfect self-defense does not apply and is not available to mitigate" unlawful shooting with intent to disable); *Richmond*, 330 Md. at 231 (holding that imperfect self-defense is inapplicable to the crime of unlawfully and maliciously wounding with intent to disable).[13] As a result of this rationale, mitigation defenses have

---

[13] Assault with intent to murder, unlawful shooting with intent to disable, and unlawfully and maliciously wounding with intent to disable are no longer distinct crimes in Maryland. Indeed, as the Court explained in *Christian*, "[i]n 1996, the General Assembly changed the legal landscape with regard to the law of assault and battery, both statutory and common law. It repealed the various assault type provisions," including the above-mentioned crimes, and replaced them with a new scheme. *Christian*, 405 Md. at 317–20. The 1996 statutes "subsumed all previous statutory assault provisions as well as

17

generally been unavailable to criminal defendants charged with assaultive crimes, save the pre-1996 statute crime of assault with intent to murder. After *Roary*, however, the Court changed course.

In *Roary*, the Court was confronted with the question of whether "first-degree assault is a proper underlying felony to support a second-degree felony-murder conviction" or whether to adopt the so-called merger doctrine under which assault cannot serve as the "underlying felony in a felony-murder conviction." *Roary v. State*, 385 Md. 217, 222, 232 (2005), *overruled by*, *State v. Jones*, 451 Md. 680 (2017). Noting Maryland's "unique[ness]" in having a felony murder rule rooted in common law, the Court rejected the merger doctrine and instead concluded "that an assault in the first degree, when committed in a manner inherently dangerous to human life . . . , may be a predicate felony for second-degree felony-murder." *Id.* at 231, 236. Because "the facts of the case d[id] not remotely raise the issue of mitigation," the Court left open the question of whether mitigation defenses would be available to criminal defendants charged with felony-murder predicated on first-degree assault. *Id.* at 235. The practical implication of the Court's holding in *Roary*, therefore, was that "a criminal homicide committed in the perpetration of or in the attempted perpetration of a" first-degree assault would "supply the element of malice necessary to raise the homicide to the level of murder." *Id.* at 232.

Three years later in *Christian*, the Court endeavored to answer the question it left open in *Roary*: namely, whether mitigation defenses, specifically hot-blooded response to

---

the common law into a single scheme and established a two-tiered regimen" -- first- and second-degree assault. *Id.* at 320 (quoting *Robinson v. State*, 353 Md. 683, 694 (1999)).

18

adequate provocation, can apply to first-degree assault.[14] *Christian v. State*, 405 Md. 306, 309–10 (2008). The Court considered "[t]he 1996 legislative repeal of the prior assault provisions, and enactment of a new assault statute," which "subsumed all previous statutory assault provisions as well as the common law." *Id.* at 320, 328 (quoting *Robinson v. State*, 353 Md. 683, 694 (1999)). Despite these changes, the Court proceeded to determine "whether mitigation defenses apply to the 1996 assault statute," by employing its "rationale in prior cases," such as *Webb* and *Richmond*, in which mitigation defenses were limited to "criminal homicide and its shadow forms." *Id.* at 328–29. The principle that mitigation defenses are applicable only to crimes which require proof of malice as that term is defined in the murder context, therefore, remained unchanged after the enactment of the 1996 assault statute. Because of *Roary*'s pronouncement that first-degree assault may serve as a predicate felony for felony-murder, the Court departed from the previous "limitation on mitigation defenses for assault." *Id.* at 330.

Although the felony-murder rule was not implicated in *Christian* -- nor is it at issue in the present case -- the Court examined the felony-murder rule because of its bearing on malice. The Court explained:

> The felony-murder rule relies on the imputation of malice from the underlying crime, in this case, first degree assault, and therefore the result of *Roary* is that the statutory crime of first degree assault . . . could supply the malice necessary to charge a defendant with murder if the victim dies. That the intent to commit first degree assault may now serve to sustain a murder

---

[14] The Court also considered whether imperfect self-defense applies to first-degree assault and concluded that it does. *Christian*, 405 Md. at 301–10. Because the common law defense of imperfect self-defense is not at issue in the present case, we do not address the Court's conclusion concerning that defense's applicability to first-degree assault.

charge convinces us that statutory first degree assault should be considered, under certain circumstances, a shadow form of homicide in Maryland. The application of mitigation defenses is still limited to only 'criminal homicide and its shadow forms' on the basis that only homicide and its shadow forms require the same proof of malice. But under *Roary*, the intent to commit first degree assault suffices to imply the malice required for a murder conviction. Where such intent may be imputed to underlie a murder conviction, the limitations in *Richmond* are no longer viable, and mitigation defenses should be available for charges of first degree assault.

*Id.* at 332–33. The conclusion that mitigation defenses are applicable to first-degree assault, therefore, was expressly premised on the reality that *Roary* created -- that an assault "could now supply the malice necessary for felony-murder if the victim dies." *Id.* at 333. Accordingly, although *Christian* departed from *Richmond* in form, it did not do so in substance. To be sure, *Christian* left intact the overarching principle that mitigation defenses are applicable only in situations where malice -- as it is defined in the context of murder -- can be negated. *Id.*

In 2017, the Court reversed course from *Roary* and held that first-degree assault can no longer serve as the underlying felony to support a felony-murder charge. *Jones*, 451 Md. at 696. As the Court saw it, *Roary*'s holding was "wrong in that it expand[ed] unwisely felony murder." *Id.* at 706. Accordingly, the Court concluded that "[f]irst-degree assault, either intent to inflict serious physical injury or assault with a firearm, cannot, as a matter of law, serve as the underlying felony to support felony murder." *Id.* at 708. Instead, post-*Jones*, a first-degree assault upon a victim that results in the death of a victim "merges with the killing" and a separate felony is required to support a felony-murder charge. *Id.*

20

**C.** **Hot-blooded response to adequate provocation's application to first-degree assault post-*Jones***

We now turn to the question of whether mitigation defenses are applicable to first-degree assault after the Court's decision in *Jones*. The State argues that, although the Court did not expressly overrule *Christian* in *Jones*, the Court's decision in *Jones* was "tantamount to doing so." The State reasons that, by explicitly overruling *Roary*, the Court in *Jones* eliminated the rationale upon which *Christian* relied. According to the State, therefore, the trial court did not abuse its discretion by refusing to instruct the jury on hot-blooded response to adequate provocation for Terance and mutual combat for Terance and Teriquo because such defenses are not available to defendants charged with assault. Appellants counter that, because *Jones* did not explicitly overrule *Christian*, the Court necessarily left the holding of *Christian* intact. Further, appellants argue that the *Christian* Court relied on more than just *Roary*. Specifically, appellants contend that the *Christian* Court "note[d] petitioners' arguments in addition to *Roary*" and that the Court's decision in *Christian* also relied on its rationale in prior cases other than *Roary*, such as *Webb v. State*, 201 Md. 158 (1952). As we shall explain, we agree with the State that the trial court did not abuse its discretion by declining to instruct the jury on the challenged mitigation defenses because such defenses were unavailable to appellants in this case.

While the Court did not expressly overrule *Christian* in *Jones*, it did not have to do so for us to conclude that hot-blooded response to adequate provocation is no longer applicable to first-degree assault. To be sure, the final line of *Christian* explicitly limited its holding to the landscape *Roary* created: "[W]e hold that the mitigation defense[] of hot-

blooded response to adequate provocation . . . could apply to mitigate first degree assault *where those assaults could now supply the malice necessary for felony-murder if the victim dies*." *Christian*, 405 Md. at 333 (emphasis added). As discussed *supra*, after *Jones*, first-degree assault can no longer supply the requisite malice for felony-murder when the victim dies. We, therefore, conclude that *Jones* rendered the holding of *Christian* inapplicable to cases where, as here, a criminal defendant is charged with assault, whether in the first or second degree.[15]

Appellants' argument that the *Christian* Court relied on more than *Roary* is ultimately unpersuasive. First, simply because the Court recited the petitioners' arguments does not mean that its holding was based on those arguments. In our view, the Court did not rely on any of the petitioners' arguments that were not premised on *Roary*. The petitioners in *Christian* offered two basic arguments not reliant on *Roary*'s holding. First, the petitioners "contend[ed] that first degree assault is the equivalent of the former crime of assault with intent to murder . . . ." *Id.* at 313. Although the Court noted that the effect of the 1996 assault statute was to "subsume[] all previous statutory assault provisions as well as the common law," it did not create a per se rule that first-degree assault is equivalent

---

[15] This conclusion is buttressed by Chief Judge Wells's analysis in *Casey v. State*, No. 1446, Sept. Term, 2022 (App. Ct. Md. Nov. 16, 2023) (unreported). *Casey* involved an unpreserved claim that the jury was not properly instructed on imperfect self-defense with respect to a first-degree assault charge. *Casey*, slip op. at 5. Although declining to exercise plain error review, Chief Judge Wells discussed the unsettled question post-*Jones*, namely, whether mitigation defenses apply to first-degree assault charges. As Chief Judge Wells aptly explained, "*Jones* held that first degree assault was not 'a shadow form' of murder, the very theory upon which *Christian* reasoned mitigation defenses apply to first degree assault. Therefore, logically it would follow that *Jones* eviscerates *Christian*." *Id.* at 14.

to assault with intent to murder, nor could it. *Id.* at 320 (quoting *Robinson*, 353 Md. at 694).

Indeed, the previous crime of assault with intent to murder required "proof of both an assault and an intention to murder." *Webb*, 201 Md. at 161. First-degree assault, however, does not require proof of an intent to murder. Md. Code (2002, 2021 Repl. Vol.), § 3-202 of the Criminal Law Article ("CR"). Accordingly, even though the Court noted that the first-degree assault statute subsumed assault with intent to murder, it did not hold that the two crimes are equivalent. Second, the petitioners in *Christian* argued that allowing mitigation defenses for first-degree assault "would eliminate an anomaly in Maryland law, whereby a defendant whose victim dies may be sentenced to less time than a defendant whose victim lives." *Christian*, 405 Md. at 314. Appellants, however, fail to direct us to where in *Christian* the Court relied on this argument in reaching its conclusion, and we cannot find where the Court did so rely.

We are similarly unpersuaded by appellants' assertion that the Court's reliance on prior cases other than *Roary* renders its holding in *Christian* applicable post-*Jones*. As we discussed *supra*, the Court's conclusion in *Christian* that mitigation defenses apply to first-degree assault followed its reasoning in prior cases, namely that mitigation defenses apply only to crimes which require proof of malice as that term is defined in the context of murder. *See Watkins*, 328 Md. at 106. The Court in *Christian* merely extended that rationale to the reality *Roary* created. Although the Court relied on its reasoning in cases

23

other than *Roary*, we are unpersuaded.[16]

In sum, we conclude that, because first-degree assault no longer supplies "the malice for felony-murder if the victim dies," the mitigation defense of hot-blooded response to adequate provocation does not apply to first-degree assault. *Id.*; *Jones*, 451 Md. at 708. The trial court, therefore, did not abuse its discretion by declining to instruct the jury on hot-blooded response to adequate provocation as it related to Terance's first-degree assault charge or mutual combat as it related to either Terance or Teriquo's first- or second-degree assault charges.[17]

---

[16] We are not persuaded by appellants' other arguments either. Terance argues that the trial court's instructions were confusing and contradictory. In support of this argument Terance notes that, although the trial court did not include him in the hot-blooded response instruction and withdrew the mutual combat instruction, the instruction on accomplice liability -- which applied to all defendants -- provided: "You must consider the defenses of voluntary intoxication, defense of others, imperfect self defense, hot blooded response and mutual combat if you find any defendant guilty of assault in any degree and by any method / theory of commission, including direct and/or accomplice liability." The trial court then read the hot-blooded response instruction for only Teriquo, referencing "the defendant" in the singular 16 times. Further, Terance notes that his verdict sheet instructed the jury: "If you find that the Defendant committed First Degree Assault, you must consider the defense of Hot Blooded Response to Legally Adequate Provocation." These inconsistencies are not dispositive. Both the oral and written instructions on defenses informed the jury as to which defendants they applied. As the State correctly points out, the jury was instructed to consider hot-blooded response for Teriquo only. Therefore, the use of defendant in the singular makes sense. Moreover, assuming there was any confusion, we are satisfied that the trial court adequately remedied it by responding "no" to the jury's question concerning whether the hot-blooded response defense applied to Terance.

[17] Because we conclude that the requested mutual combat instruction was not applicable in this case, we do not address the extent to which the trial court did, or did not, have the burden to propound a correct instruction after it found that appellants' instruction failed to address the proper allocation of the burden of proof. Similarly, because we conclude that hot-blooded response to adequate provocation was not available to Terance,

**II.    The trial court did not abuse its discretion by instructing the jury on flight.**

Next, appellants argue that the trial court abused its discretion by instructing the jury on flight because no evidence adduced at trial demonstrated flight. Rather, appellants assert that the evidence merely shows that "[b]y means of normal, human locomotion, they departed the scene."

We review a trial court's decision to provide a particular jury instruction for abuse of discretion. *Wright v. State*, 474 Md. 467, 482 (2021). When conducting such review, we consider whether the instruction: (1) is a correct statement of law; (2) is applicable under the facts of the case; and (3) was not fairly covered by the court's other instructions to the jury. *Id.* 484 (citing *Thompson v. State*, 393 Md. 291, 302 (2006)); *see also* Md. Rule 4-325(c).

Appellants do not contend that the flight instruction given by the trial court was an incorrect statement of law.[18] or that the substance of the instruction was sufficiently covered

---

we do not address whether the trial court's consideration of what impact the giving of such an instruction for Terance would have on Teriquo's defense was proper.

[18] The instruction propounded by the trial court provided that:

> A person's flight or concealment immediately after the commission of a crime, or after being accused of committing a crime, is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt. Flight or concealment under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether there is evidence of flight or concealment. If you decide there is evidence of flight or concealment, you then must decide whether this flight or concealment shows a consciousness of guilt.

by other jury instructions.  The only question before us, then, is whether the instruction was applicable under the facts of the case.  Whether the requesting party produced the minimum threshold of evidence to generate the instruction is a question of law, which we review *de novo*.  *Bazzle v. State*, 426 Md. 541, 550 (2012).  This is a low evidentiary threshold requiring the requesting party to merely produce "some evidence" to support the legal theory underlying the instruction.  *Id.* at 551.

The Court has explained the relevant standard for considering whether there is "some evidence" to render a flight instruction applicable to the facts of a particular case:

> [F]or an instruction on flight to be given properly, the following four inferences must reasonably be able to be drawn from the facts of the case as ultimately tried: that the behavior of the defendant suggests flight; that the flight suggests a consciousness of guilt; that the consciousness of guilt is related to the crime charged or a closely related crime; and that the consciousness of guilt of the crime charged suggests actual guilt of the crime charged or a closely related crime.

*Thompson*, 393 Md. at 312.  We review the evidence in the light most favorable to the requesting party, here the State.  *McMillan v. State*, 428 Md. 333, 355 (2012).

The instant case involves the first and second inferences.  We explained the difference between "flight" and "mere departure" in *Hoerauf v. State*, 178 Md. App. 292, 323–26 (2008).  There, we explained that

> an accused's departure from the scene of a crime, without any attendant circumstances that reasonably justify an inference that the leaving was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt, does not constitute "flight," and thus does not warrant the giving of a flight instruction.

26

*Id.* at 325–26. In addition to evidence "that the defendant has moved from one location to another," therefore, there must be "some additional proof to suggest that this movement is not simply normal human locomotion." *Id.* at 323 (citation omitted). The "classic" case of flight in the context of leaving a crime scene "is where a defendant leaves the scene shortly after the crime is committed and is running, rather than walking, or is driving a speeding motor vehicle." *Id.* at 324.

Our review of the record leads us to conclude that the State proffered "some evidence" from which the jury could infer that appellants departed from the scene in a manner suggesting that "the leaving was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt." *Id.* at 325. Frank's Den's surveillance video shows that at approximately 11:01:21 p.m., Terance walked over to where Bates was with Pulley's help and proceeded to make stomping motions over Bates's body. Terance and Teriquo then walked to a vehicle on the far side of the parking lot and entered it with Teriquo in the driver's seat. Between approximately 11:02:11 and 11:02:40 p.m., the video shows several people in the area indicating concern and at least one witness pulling out their phone after seeing Bates's body. Appellants' vehicle passes an exit from the bar's parking lot to Crain Highway and, at approximately 11:02:45 p.m., drives around the side of the bar where Pulley and three individuals are checking on Bates. The vehicle comes close enough to where the crowd is standing that one of the individuals jogs away before returning once the vehicle is out of view. At approximately 11:02:53 p.m., the Anne Arundel County Police Department received a call reporting that Bates was in the parking lot breathing, but unconscious.

27

The State characterized the video footage as demonstrating two things: that appellants were trying to get home as quickly as possible.[19] and that they were doing so in a manner that could be inferred to be reckless as evidenced by appellants almost hitting Bates with their vehicle. Appellants contend that the evidence shows no more than a mere departure. In our view, however, the trial court properly left the issue of whether the circumstances constituted flight for the jury to decide. *See Thompson*, 393 Md. at 303 ("[W]e have recognized that a defendant's flight may be motivated by reasons unconnected to the offense at issue in the case and that the determination as to the motivation for flight is properly entrusted to the jury.") The evidence clearly shows that appellants left the scene hastily after the assault occurred and mere seconds before the police were called. Viewing the evidence in the light most favorable to the State, there were several "attendant circumstances" from which the jury could have reasonably inferred that appellants' departure from the scene following the assault was "not simply normal human locomotion." *Hoerauf*, 178 Md. App. at 323 (citation omitted).

Terance also argues that, because he was unconscious for much of the altercation between Teriquo and Bates, there was no evidence that he formulated the requisite

---

[19] An aerial view map of the bar and surrounding area admitted into evidence showed that the north- and south-bound lanes of Crain Highway are separated. To reach the south-bound lanes from the bar's parking lot, therefore, motorists have one of two options. First, they can travel north-bound on Crain Highway directly from the bar's parking lot and then U-turn further down Crain Highway to get to the south-bound lanes. Second, they can proceed to the back exit of the bar's parking lot on Old Stage Road and drive approximately a block to Mayo Road. From Mayo Road, there is a traffic light from which motorists can access Crain Highway's north- or south-bound lanes. By passing the parking lot's Crain Highway exit in favor of the back exit, therefore, the State reasoned that appellants took the exit that would get them home the quickest.

consciousness of guilt. We are not persuaded. Indeed, prior to leaving the scene, Terance was conscious and rejoined the fight. Simply because Terance needed assistance to walk over to Bates to re-engage -- or later to get to the car -- does not change our conclusion that there was sufficient evidence from which the jury could infer Terance was able to formulate the requisite consciousness of guilt at the time he and Teriquo departed from the scene. We, therefore, conclude that the trial court did not abuse its discretion by instructing the jury on flight.

**III.    There was sufficient evidence for a reasonable jury to convict Terance of first-degree assault and Teriquo of rogue and vagabond.**

We turn now to the question of whether there was sufficient evidence for the jury to convict Terance of first-degree assault and Teriquo of rogue and vagabond. When appellants challenge the sufficiency of the evidence underlying a criminal conviction, "the critical inquiry on review . . . is whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. State*, 415 Md. 174, 184 (2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). It is not our role to "second-guess the jury's determination where there are competing rational inferences available." *Id.* at 183.

The sufficiency of the evidence standard "applies to all criminal cases, regardless of whether the conviction rests upon direct evidence, a mixture of direct and circumstantial, or circumstantial evidence alone." *Id.* at 185 (citing *State v. Smith*, 374 Md. 527, 534 (2003)). "Maryland has long held that there is no difference between direct and circumstantial evidence." *Palmer v. State*, 266 Md. App. 693, 708 (2025) (quoting

29

*Jensen v. State*, 127 Md. App. 103, 117 (1999)). In fact, circumstantial evidence alone may sustain a conviction, "provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused." *Id.* (quoting *Handy v. State*, 175 Md. App. 538, 562 (2007)). Such inferences, however, "must rest upon more than mere speculation or conjecture." *Smith*, 415 Md. at 185 (citing *Bible v. State*, 411 Md. 138, 157 (2009)). We view any such "reasonable inferences deducible from the evidence in the light most favorable to the State." *Id.* at 186 (citation omitted).

### A. Terance's first-degree assault conviction

Under the first-degree assault statute, "[a] person may not intentionally cause or attempt to cause serious physical injury to another." CR § 3-202(b)(1). The State's theory was battery. Accordingly, to convict Terance of first-degree assault, the jury had to conclude:

(1) that Terance caused offensive physical contact with or physical harm to Bates;

(2) that the contact was the result of an intentional or reckless act of Terance and was not accidental;

(3) that the contact was not consented to by Bates and was not legally justified; and

(4) that Terance intended to cause serious physical injury in the commission of the assault.

*See* Maryland Criminal Pattern Jury Instructions ("MPJI-Cr") §§ 4:01; 4:01.1A (3d ed. 2025). Serious physical injury is defined as a "physical injury that: (1) creates a substantial

30

risk of death; or (2) causes permanent or protracted serious: (i) disfigurement; (ii) loss of any bodily member or organ; or (iii) impairment of the function of any bodily member or organ." CR § 3-201(d).

Terance argues that there was insufficient evidence for the jury to convict him of first-degree assault. Terance reasons that, because the trial court granted his motion for judgment of acquittal on the attempted murder and conspiracy to commit murder charges, it should have similarly acquitted him of first-degree assault. Terance suggests that, because the trial court determined there was insufficient evidence for the jury to conclude beyond a reasonable doubt that he intended to kill Bates, there was similarly insufficient evidence that he intended to cause serious physical injury to Bates. In support of this contention, Terance references the surveillance video, which he characterizes as showing him "stumbling to his feet with Pulley's help" and "unsteadily approaching" Bates. Similarly, Terance contends that, because the trial court and the State both agreed that the surveillance video did not show Terance's foot actually making contact with Bates's head, the jury was left to speculate as to whether Terance caused offensive physical contact with or physical harm to Bates. According to Terance, therefore, the trial court abused its discretion in permitting the jury to consider first-degree assault.

The State counters that, because attempted murder and conspiracy to commit murder, on the one hand, and first-degree assault on the other, involve differing elements of intent, the trial court properly granted Terance's motion for judgment of acquittal for the former charges while denying it for the latter. Further, the State contends that the first round of fighting between Terance and Bates -- which occurred prior to Terance being

31

knocked out -- could have given rise to a conviction of first-degree assault. Our review of the record leads us to conclude that there was sufficient evidence to support Terance's conviction for first-degree assault.

First, there was sufficient circumstantial evidence from which the jury could have inferred that Terance acted with the intent to cause serious physical injury to Bates. *See Chilcoat v. State*, 155 Md. App. 394, 403 (2004) ("Although the State must prove that an individual had a specific intent to cause a serious physical injury . . . a jury may infer the necessary intent from an individual's conduct and the surrounding circumstances, whether or not the victim suffers such an injury."). Indeed, "the jury may infer that one intends the natural and probable consequences of his act." *Id.*

Here, as the State aptly notes, there was sufficient evidence for the jury to conclude that Terance acted with the intent to cause serious physical injury both at the outset of the fight and again after Pulley helped him up. To be sure, the video surveillance footage shows Terance hitting Bates in the head with a can of spray paint at the beginning of the fight and continuing to swing at and, at a minimum, graze Bates as the two circled cars in the parking lot. After Pulley helped him up, Terance walked back towards Bates and made a kicking or stomping motion towards Bates's head. Hitting, or attempting to hit, someone in the head multiple times could naturally cause serious physical injury to the person being hit. We, therefore, are satisfied that there was sufficient evidence from which the jury could reasonably infer that Terance acted with the intent to cause serious physical injury to Bates at either the outset or the end of the fight.

32

Similarly, there was sufficient evidence from which the jury could conclude that Terance caused offensive physical contact with or physical harm to Bates. Terance asserts that his conduct at the outset of the fight was insufficient to support a first-degree assault charge because he did not cause serious physical injury to Bates by hitting him with a can of spray paint, as evidenced by the fact that Bates delivered a tough blow to him shortly thereafter. This argument, however, misunderstands what the State was required to prove. Indeed, the State was not required to prove that Terance *caused* serious physical injury; rather it had to prove that Terance *intended* such a result. As we explained above, there was sufficient evidence from which the jury could conclude Terance possessed that intent. With regard to what contact actually resulted, the State only had to prove that Terance caused offensive physical contact with or physical harm to Bates.

The surveillance video depicted Bates immediately bringing up his hand to touch his head after Terance hit him with the can of spray paint. Further, as noted, the jury could have inferred that Terance's last action -- the stomping or kicking motion at Bates's head -- caused physical harm to Bates. The jury was not required to see Terance's foot make contact with Bates for it to infer that such contact was in fact made. Indeed, the jury heard evidence that Bates sustained a traumatic brain injury and witnessed firsthand the effects of that injury, namely that Bates could not remember being at the bar that night, did not recall how he sustained his injuries, and did not remember ever interacting with the co-defendants. Taken together, we are satisfied that there was sufficient evidence from which the jury could conclude that Terance caused offensive physical contact with or physical harm to Bates.

33

Notably, the trial court found such evidence insufficient to support the attempted murder and conspiracy to commit murder charges and accordingly granted Terance's motion for judgment of acquittal on those charges. That does not mean, however, that such evidence was similarly insufficient to sustain the jury's conviction of first-degree assault. To be sure, the trial court's comments when ruling on the motion for judgment of acquittal were in the context of the two different charges. The trial court reasoned that while there was insufficient evidence for the jury to infer that Terance intended to kill Bates, there was sufficient evidence that he intended to cause serious physical injury.

We are similarly unpersuaded by Terance's mischaracterization of the State's comment that one could not tell from the surveillance video whether Terance "makes contact with" Bates's head. As the State observes, viewing the record as a whole, this statement was no more than a comment on the angle of the camera -- which left Bates's body out of view. As noted, however, circumstantial evidence is sufficient to sustain a conviction. We, therefore, conclude that there was sufficient evidence for the jury to convict Terance of first-degree assault.[20]

---

[20] Terance also challenges the trial court's recitation of the jury instructions concerning assault. When reading the instructions to the jury, the trial court read the attempted battery theory version of assault to the jury twice. Counsel then informed the trial court that it should have instead read the instruction on the battery theory of assault. The trial court quickly informed the jury of the error and read the battery theory of assault instruction. The instructions that the jury received included the correct instruction. We are satisfied that the trial court remedied any confusion by its prompt reading of the correct instruction and its inclusion of the correct instruction in the printed jury instructions upon which the jury relied during its deliberations.

34

## B.     Teriquo's rogue and vagabond conviction

Teriquo was charged and convicted of rogue and vagabond under CR § 6-206(b), which prohibits "be[ing] in or on the motor vehicle of another with the intent to commit theft of the motor vehicle or property that is in or on the motor vehicle." On appeal, Teriquo argues that there was insufficient evidence to sustain his conviction for two reasons. First, Teriquo contends that the State failed to prove that the vehicle with which Teriquo interacted was in fact Bates's vehicle. Teriquo reasons that, because he was charged with rogue and vagabond based on his interaction with Bates's vehicle specifically, the State had the burden of proving that the vehicle in question did in fact belong to Bates and that it should have done so with direct evidence such as a Motor Vehicle Administration ("MVA") record. Second, Teriquo argues that, because the surveillance video does not clearly show what he was doing in the vehicle or what his intent was, there was insufficient evidence for the jury to convict him of rogue and vagabond.

As to the first argument, the State counters that it was not required to offer proof that the vehicle belonged to Bates via an MVA record. Rather, the State asserts that there was sufficient circumstantial evidence that the vehicle Teriquo reached into was Bates's, such as the surveillance video depicting Bates opening the driver's side door of the vehicle moments before. Similarly, the State contends that there was sufficient circumstantial evidence -- such as Teriquo's unlawful presence in the vehicle and proximity to pilferable items -- from which the jury could reasonably infer Teriquo's intent. We agree with the State that there was sufficient evidence of both Teriquo's intent and the fact that the vehicle in question belonged to Bates.

35

As a preliminary matter, we reject Teriquo's attempt to create some sort of "better" evidence rule. Although the State was entitled to proffer an MVA record to prove that the vehicle Teriquo entered was owned by Bates, it was equally entitled to establish Bates's ownership of the vehicle in the precise way in which it did -- through circumstantial evidence. Indeed, as we explained above, it is well established in Maryland "that there is no difference between direct and circumstantial evidence." *Palmer*, 266 Md. App. at 708 (quoting *Jensen*, 127 Md. App. at 117). So long as the circumstantial evidence proffered by the State supported "rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of" Teriquo's guilt, no direct evidence was needed. *Id.* at 708 (quoting *Handy*, 175 Md. App. at 562).

Viewed in the light most favorable to the State, the surveillance video depicts Bates opening the driver's side door of the vehicle in question as if to put something inside. Bates backs away from the vehicle only after Terance came at him. Seconds later, Teriquo opened the driver's side door of the same vehicle and reached in. Under these circumstances, we are satisfied that there was sufficient circumstantial evidence from which the jury could infer Bates's ownership of the vehicle.

Similarly, it was permissible for the State to prove Teriquo's intent by circumstantial evidence alone. "Intent is rarely shown by direct evidence." *Fetrow v. State*, 156 Md. App. 675, 692 (2004). Rather, intent is often "shown by circumstantial evidence, that is facts that permit a reasonable inference that the intent existed." *Id.* at 691 (citation omitted). A criminal defendant's "unlawful presence, immediately proximate to pilferable items, [may be] the necessary fact or circumstance . . . in addition to the proof of the mere

36

breaking and entering from which the trier of the facts can find the intent." *In re John A.*, 44 Md. App. 476, 479 (1980) (internal quotation marks and citation omitted).

The State was required to prove that Teriquo was in the vehicle in question "with the intent to commit theft of the motor vehicle or property that is in or on the motor vehicle." CR § 6-206(b). Viewed in the light most favorable to the State, the surveillance video demonstrated that seconds after Bates opened the driver's side door of the vehicle as if to put something inside, Teriquo opened the driver's side door of the same vehicle and reached inside. With the upper half of his body in the vehicle, Teriquo rummaged through the contents of the vehicle. Teriquo's unlawful presence in a vehicle that was not his -- and which the jury could infer belonged to Bates -- put him in close proximity of pilferable items. Taken together, there was sufficient evidence from which the jury could infer Teriquo's intent to commit theft of property in the vehicle. Accordingly, we find no error in Teriquo's conviction of rogue and vagabond.

## CONCLUSION

For the foregoing reasons, we conclude that the trial court did not err in declining to instruct the jury on hot-blooded response to adequate provocation and mutual combat because such defenses do not apply to first- or second-degree assault. We also conclude that there was some evidence to generate a flight or concealment instruction. Finally, we conclude that there was sufficient evidence to support Terance's first-degree assault conviction and Teriquo's rogue and vagabond conviction. We, therefore, affirm the judgments of the circuit court.

37

**JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**